**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

DOUGLAS YOUNG,

              Defendant.

No. CR 12-4107-MWB

**SENTENCING OPINION AND STATEMENT OF REASONS PURSUANT TO 18 U.S.C. § 3553(c) DISCUSSING THE DRAMATIC NATIONAL DISPARITY IN THE DEPARTMENT OF JUSTICE'S APPLICATION OF 21 U.S.C. § 851 ENHANCEMENTS**

_____

## TABLE OF CONTENTS

I.      *INTRODUCTION – DEFENDANT DOUGLAS YOUNG*............................4

II.    *THE OVERVIEW* ........................................................................ 7
      A.    *How The § 851 Enhancement Works*............................................. 7
      B.    *A Brief History Of Recidivist Enhancements And § 851*.................... 9
      C.    *Lack Of A National DOJ § 851 Policy* ....................................... 12
      D.    *The Wheel of Misfortune* ....................................................... 15
      E.    *Other Problems With The Arbitrary Workings Of § 851 Enhancements*................................................................ 18

III.   *ANALYSIS OF THE COMMISSION'S § 851 DATA*.............................. 21
      A.    *Overview Of The Underlying Data On § 851 Enhancements* ............ 21
      B.    *Northern District Of Iowa - § 851 Application Disparity* ................. 25
      C.    *The Eighth Circuit – § 851 Application Disparity*........................... 28
      D.    *Intra-circuit – § 851 Application Disparity* ................................. 34
      E.    *Intra-state And National – § 851 Application Disparity*................... 37
      F.    *Summary* ........................................................................... 39

IV.   THE ROLE OF THE JUDICIARY IN ATTEMPTING TO
      CORRECT THE PROBLEM .......................................... 39

V.    THE DOJ, THE AUDACITY OF HYPOCRISY, AND THE
      OPPORTUNITY FOR ATONEMENT ............................... 43

VI.   CONCLUSION ............................................................. 49

VII.  APPENDICES ................................................................ i
      A.    Appendix A ......................................................... i
      B.    Appendix B ......................................................... v
      C.    Appendix C ..................................................... viii
      D.    Appendix D ..................................................... xiii
      E.    Appendix E ..................................................... xvii
      F.    Appendix F ...................................................... xxi

    This case presents a deeply disturbing, yet often replayed, shocking, dirty little secret of federal sentencing:  the stunningly arbitrary application by the Department of Justice (DOJ) of § 851 drug sentencing enhancements.[1]  These enhancements, at a

---

[1] 21 U.S.C. § 851 (2012).  On August 12, 2013, while I was completing the drafting of this ruling, Attorney General Holder disseminated his Memorandum to the United States Attorneys and Assistant Attorney General for the Criminal Division: Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (August 12, 2013) (Holder 2013 Memo), which belatedly established a national policy on § 851 enhancements.  I am cautiously

minimum, double a drug defendant's mandatory minimum sentence and may also raise the maximum possible sentence, for example, from forty years to life.[2] They are possible any time a drug defendant, facing a mandatory minimum sentence in federal court, has a prior qualifying drug conviction in state or federal court (even some state court misdemeanor convictions count), no matter how old that conviction is.

Recent statistics obtained from the U.S. Sentencing Commission (Commission)—the only known data that exists on the eligibility and applications of the DOJ's § 851 decision making—reveal jaw-dropping, shocking disparity. For example, a defendant in the Northern District of Iowa (N.D. of Iowa) who is eligible for a § 851 enhancement is 2,532% more likely to receive it than a similarly eligible defendant in the bordering District of Nebraska. Equally problematic is that, at least prior to August 12, 2013, decisions to apply or waive § 851 enhancements were made in the absence of any national policy, and they are still solely within the unreviewed discretion of the DOJ without any requirement that the basis for the decisions be disclosed or stated on the record. This is true even for non-violent, low-level drug addicts. These decisions are shrouded in such complete secrecy that they make the proceedings of the former English Court of Star Chamber appear to be a model of criminal justice transparency. *See In re Oliver*, 333 U.S. 257, 266–271 (1948) ("The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by . . . the English Court of Star Chamber."). Attorney General Holder's August 12,

---

encouraged to see the changes, which could lead to much less arbitrary, less racially discriminatory, and fairer and more just application of the § 851 enhancements. These benefits could come to pass, however, only if this new policy—and from experience the "if" needs to be strongly emphasized—is actually uniformly implemented and followed in the 94 districts, admittedly a daunting task for an Attorney General and the Criminal Division.

[2] 21 U.S.C. § 841(b)(1)(B)(viii) (2012).

2013, Memorandum to the United States Attorneys and Assistant Attorney General for the Criminal Division: Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (Holder 2013 Memo), while establishing a national policy for § 841 enhancements, does nothing to pull aside the cloak of secrecy shrouding the nationwide disparities in the application of § 851 enhancements.

## I. INTRODUCTION – DEFENDANT DOUGLAS YOUNG

Defendant Douglas Young, whose situation brings the issue of the § 851 enhancement before me now, pleaded guilty to conspiracy to distribute 28 grams or more of cocaine base following a prior conviction for a felony drug offense (count 1) and possession with intent to distribute 28 grams or more of cocaine base (count 2) in violation of 21 U.S.C. §§ 846, 841(b)(1)(B), and 851. His preliminary Presentence Investigation Report revealed, *inter alia*, that he is a 37-year-old African-American male with a Total Offense Level of 29, and 3 criminal history points, putting him in Criminal History Category II. Mr. Young's advisory U.S. Guideline range was 93 to 121 months. His entire criminal history scoring consisted of one offense—a conviction in Cook County, Illinois, in 1996, at age 20, for the manufacture/delivery of a controlled substance—cocaine base. He received probation, which he successfully completed without notation of any probation violations. His mandatory minimum sentence of 60 months is doubled to 120 months as a result of a § 851 enhancement for this 17-year-old conviction, and his maximum sentence of 40 years is increased to life, as well. However, after objections were filed by defense counsel, Mr. Young argued that his one prior conviction should receive no criminal history points, and the AUSA, the U.S. probation officer, and I agreed. Thus, Mr. Young is in Criminal History Category I and is now safety-valve eligible.

Both pre-[3] and post-[4] Fair Sentencing Act,[5] I have used a 1:1 crack-to-powder ratio, rather than the historical 100:1 ratio prior to the FSA and the current 18:1 ratio post-FSA. If I use this 1:1 ratio, Mr. Young would have a base offense level of 26, minus 3 levels for acceptance of responsibility, for a Total Offense level of 23. Combined with his Criminal History Category II, this results in an advisory Guideline range of 51 to 63 months. However, in the final PSR, Mr. Young dropped to a Criminal History Category I, and is now safety-valve eligible with a Guideline range of 70 to 87 months, which lowers to 37 to 46 months using the 1:1 ratio. Because Mr. Young is safety-valve eligible, he no longer has the 5-year mandatory minimum, and the § 851 enhancement no longer doubles that mandatory minimum, but it still raises his maximum statutory sentence to life

Nevertheless, in a somewhat bizarre "O. Henry" ending, the AUSA did make a substantial assistance motion, but also made a Motion For Upward Departure For Under-Representation Of Criminal History (docket no. 88), because Mr. Young's Criminal History Category is I, despite his previous conviction for a felony drug-trafficking offense in 1996. I say "bizarre," because a strong argument can be made that Mr. Young is in the class of 74% of defendants nationally who are eligible for a § 851 enhancement, yet have it waived. It seems that a defendant, like Mr. Young, who pleads guilty, signs a cooperation plea agreement, actually cooperates to the degree to earn a prosecution recommendation for a substantial assistance reduction (which, in this district, is a very high bar), and who has a 17-year-old predicate state court drug conviction, where he received probation and successfully completed it, so that he

---

[3] *United States v. Gully*, 619 F. Supp. 2d 633 (N.D. Iowa 2009).

[4] *United States v. Williams*, 788 F. Supp. 2d 847 (N.D. Iowa 2011).

[5] Pub. L. No. 111-220, 124 Stat. 2372.

received no criminal history points, is likely the kind of defendant who should receive a waiver of his § 851 enhancement. I denied the AUSA's Motion For Upward Departure. Thus, owing to the convoluted workings of Mr. Young's criminal history scoring, making him safety-valve eligible, and my rejection of the AUSA's attempt to reimpose sentencing consequences for Mr. Young's prior conviction, the harsh effect of a § 851 enhancement here was minimized for Mr. Young—but that is a very rare occurrence in this district.

Addressing the individual 3553(a) factors, I find that the 1:1 ratio issue is the only mitigating factor, which is why I am not varying any lower than the revised 1:1 ratio range of 37 to 46 months. Mr. Young asserted that the following aspects of his history and characteristics warranted a lower sentence:

- He was born in Chicago and had an unstable childhood;

- His mother was a drug addict, who was eventually murdered in 2008;

- His father was often absent from the family home as he traveled in the United States Army;

- At one point in his childhood, the State of Illinois Department of Children and Family Services conducted a home study and found that his mother was neglectful of him and his sister. Although no removal proceedings were conducted, he and his sister eventually moved in with their maternal grandmother;

- He has a history of marijuana use and completed a drug treatment program while on supervised release; and

- He was compliant while on pretrial release and, while he should not get kudos for doing what he is supposed to be doing, his being compliant on pretrial release indicates that he is amenable to supervision.

Defendant's Brief In Support Of Motion For Downward Variance (docket no. 87-1), 3-4. I have balanced against these mitigating factors the following aggravating factors:

- The length of the charged drug conspiracy and the frequency of purchases for distribution;

- The lack of any reportable Social Security Administration (SSA) income for years 2008 through 2012 and very minimal reportable income for years 2003 to 2007;

- His claims of self-employment income from cutting hair of $500 per month from 2010 to the present, with no record of SSA earnings for those years; and

- His child-support obligation of $200 per month, but in arrears by over $10,000

Balancing all relevant factors, Mr. Young's August 12, 2013, Motion For Downward Variance (docket no. 87) is granted only to the extent that I have applied a 1:1 ratio. Ultimately, after evaluating the U.S.S.G. § 5K1.1 factors, I did reduce Mr. Young's sentence, based solely on application of a 1:1 ratio and Mr. Young's substantial assistance, to 24 months of incarceration followed by 4 years of supervised release on each count, to run concurrently, with certain other conditions as stated on the record.

## II.    THE OVERVIEW

### A.    How The § 851 Enhancement Works

I turn now to the § 851 enhancement issue in this and other cases. Pursuant to the penalty provisions set forth in 21 U.S.C. § 841(b)(1), enhanced penalties, including

increased mandatory minimum and maximum terms of imprisonment, apply if the defendant has a prior conviction for a "felony drug offense." "Felony drug offense" is defined as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44). This sweeping definition includes many state drug convictions that the various states define under state law as misdemeanors. Unlike criminal history scoring under the Federal Sentencing Guidelines, no conviction is too old to be used as an enhancement. These enhancements are usually referred to as "§ 851 enhancements" because 21 U.S.C. § 851 establishes and prescribes certain notice and other procedural requirements that trigger them.[6]

In my experience, many § 851 enhancements involve only relatively minor state drug offenses classified as some variation of a misdemeanor under state law. Many predicate prior offenses are also decades old, where the defendant never served so much as one day in jail, and often paid only a small fine.

The highest penalties in federal drug cases are for convictions under 21 U.S.C. § 841(b)(1)(A). This subsection applies when the offense of conviction involves specifically identified drugs coupled with specific quantities of those drugs. A first-time drug offender convicted under § 841(b)(1)(A) faces a statutory mandatory

---

[6] The procedural requirements include notice by way of information prior to trial or plea filed by the U.S. Attorney "stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). Section 851(b) provides the defendant and the defense attorney an opportunity to affirm or deny the predicate convictions. If the defendant denies the prior convictions or claims they are invalid, the court shall hold a hearing and at the request of either party "shall enter finding[s] of fact and conclusions of law." 21 U.S.C. § 851(c)(1). Also, a person alleging the prior conviction was obtained in violation of the U.S. Constitution is required to set forth the basis with "particularity." 21 U.S.C. § 851(c)(2).

minimum sentencing range of ten years and a maximum sentence of life. With a prior "felony drug conviction," the mandatory minimum doubles to twenty years. With two prior "felony drug convictions," a mandatory life sentence must be given. 21 U.S.C. § 841(b)(1)(A). On the other hand, § 841(b)(1)(B) applies to offenses involving lower quantities of drugs. A five-year mandatory minimum applies with no "prior felony drug" convictions, while a prior "felony drug" conviction, doubles the mandatory minimum to ten years.[7]

## B. A Brief History Of Recidivist Enhancements And § 851

The modern history of experimentation with enhancements for prior drug convictions can be traced back to the 1964 amendments to the Narcotic Drug Import and Export Act of 1958.[8] This statutory scheme automatically required the mandatory

---

[7] As used in this opinion, the phrase "at least doubles" the sentence or similar phrases refers to the above description of how § 851 enhancements works. Unfortunately, the Commission's data does not reveal when more than one § 851 enhancement was actually applied to the same defendant.

[8] Title 21 U.S.C. § 174 (1964), provided, as follows:

> Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section

minimum sentence to be doubled when the offender had a qualifying prior drug conviction. Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, better known as the Controlled Substances Act (CSA), repealed and replaced the Narcotic Drug Import and Export Act. Pub. L. No. 91-513, 84 Stat. 1236 (Oct. 27, 1970), codified at 21 U.S.C. §§ 801-904. The CSA afforded judges and prosecutors some leeway for the application of the prior drug conviction enhancement. The CSA also replaced mandatory minimum sentences with maximum sentences for what has become 21 U.S.C. § 841.

The House Committee, in reporting on the House bill, explained the reasons for revising the penalty structure:

> The foregoing sentencing procedures give maximum flexibility to judges, permitting them to tailor the period of imprisonment, as well as the fine, to the circumstances involved in the individual case.

---

7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.

Title 26 U.S.C. § 7237(c)(1) (1964), provided, as follows:

> (c) Conviction of second or subsequent offense. -
>
> (1) Prior offenses counted. - For purposes of subsections (a), (b), and (d) of this section, subsections (c) and (h) of section 2 of the Narcotic Drugs Import and Export Act, as amended (21 U.S.C. sec. 174), and the Act of July 11, 1941, as amended (21 U.S.C. sec. 184a), an offender shall be considered a second or subsequent offender, as the case may be, if he previously has been convicted of any offense the penalty for which was provided in subsection (a) or (b) of this section. . . .

The severity of existing penalties, involving in many instances minimum mandatory sentences, have led in many instances to reluctance on the part of prosecutors to prosecute some violations, where the penalties seem to be out of line with the seriousness of the offense. In addition, severe penalties, which do not take into account individual circumstances, and treat casual violators as severely as they treat hardened criminals, tend to make convictions somewhat more difficult to obtain. The committee feels, therefore, that making the penalty structure in the law more flexible can actually serve to have a more deterrent effect than existing penalties, through eliminating some of the difficulties prosecutors and courts have had in the past arising out of minimum mandatory sentences.

H. Rep. No. 91-1444, 91st Cong., 2d Sess., 1970 U.S. Code Cong. & Admin. News, pp. 4566, 4576.

In *United States v. Noland*, 495 F.2d 529 (5th Cir. 1974), the first appellate case to be decided under the enhancement section of the 1970 CSA, the court understood this flexibility to be used in situations where neither the prosecutor, nor the court thought the enhancement desirable or necessary. *Id*. at 532. The court in *Noland* determined that it was up to the U.S. Attorney to seek enhancement if the sentence was to be doubled. Judge Sidney Thomas noted, in discussing *Noland*, that "the statutory scheme was completely everted: rather than requiring courts to impose mandatory minimums regardless of prosecutorial desire, courts were prohibited from enhancing sentences unless the government had timely filed an information stating that it intended to seek an enhanced sentence based on specific prior convictions." *United States v. Severino*, 268 F.3d 850, 863 (9th Cir. 2001). So, the Congressional motivation for the injection of prosecutorial discretion for the sentencing enhancement was to overcome the temptation for prosecutors *not* to charge offenders in situations where the court was likely to impose an unduly harsh sentence because of a qualifying prior drug offense.

This is the opposite of the application of § 851 enhancements as currently applied in the N.D. of Iowa, where it is applied in four out of five eligible cases.

## C.   Lack Of A National DOJ § 851 Policy

Until earlier this week, the DOJ did not appear to have a national policy[9] for the 94 districts as to when or why to seek a § 851 enhancement and, in the N.D. of Iowa, there was no discernible local policy or even a whiff of an identifiable pattern. I have never been able to discern a pattern or policy of when or why a defendant receives a § 851 enhancement in my nearly 20 years as a U.S. district court judge who has sentenced over 3,500 defendants, mostly on drug charges. I asked one of our district's most respected supervisors of probation officers to inquire among all of this district's probation officers who write pre-sentence reports if any could discern a pattern. I received the following response: "I had a chance to talk with each of the writers and the consensus is that there really is no rhyme or reason to when the § 851

---

[9] The "Ashcroft Memo," dated Sept. 22, 2003, does mention briefly a superficial "policy" on § 851 enhancements in that they should be sought in "all appropriate cases," but they could be waived "only after giving particular consideration to the nature, dates, and circumstances of the prior convictions, and the extent to which they are probative of criminal propensity." John Ashcroft, Attorney General, Memo Regarding Policy On Charging Of Criminal Defendants (U.S. Department of Justice, Sept. 22, 2003) (Ashcroft Memo), available at www.justice.gov/opa/pr/2003 /September/03_ag_516.htm (last visited Aug. 13, 2013); see Sarah French Russell, *Rethinking Recidivist Enhancements: The Role of Prior Drug Convictions in Federal Sentencing*, 43 U.C. DAVIS L. REV. 1135, 1164, (2010) [hereinafter *Rethinking Recidivist Enhancements*]. The Ashcroft Memo was superseded by the "Holder 2010 Memo" on Department Policy on Charging and Sentencing, dated May 19, 2010, which makes no specific reference to § 851 enhancements. Eric J. Holder Jr., Attorney General, Memorandum to All Federal Prosecutors, Department Policy on Charging and Sentencing (May 19, 2010) (Holder 2010 Memo), available at www.justice.gov/oip/holder-memo-charging-sentencing.pdf (last visited Aug. 13, 2013). It was not until the Holder 2013 Memo, dated August 12, 2013, replaced the Holder 2010 Memo that the DOJ established a national policy for § 851 enhancements.

[enhancement] is filed and when it is not." I have also repeatedly asked defense counsel, on the record, if they are able to discern a pattern as to when their clients, who are eligible for a § 851 enhancement, receive it and when it is waived. Not a single defense lawyer has ever been able to articulate a pattern—other than the criminal defense lawyers from Omaha, Nebraska, who routinely indicate that, had the case been in the District of Nebraska, the § 851 notice would have been waived. These on-the-record statements by the Omaha criminal defense lawyers are validated by the data from the Commission. These data establish that, for the three-year sampling period, an eligible defendant in the N.D. of Iowa had a whopping 2,532% greater likelihood of receiving a § 851 enhancement than the same defendant in the District of Nebraska. *See* App. C, Figure 2C.

In eight of the Nation's ninety-four federal districts, § 851 enhancements have been waived in every case, regardless of whether the defendant pleads, goes to trial, or cooperates, with or without receiving a substantial assistance motion. In many other districts, the § 851 enhancements were used as a plea hammer to induce a defendant to plead—then withdrawn when the defendant did plead. In the N.D. of Iowa, already this year, I have sentenced numerous defendants with § 851 enhancements, regardless of whether they pled, or pled and cooperated, and did or did not receive a substantial assistance motion. Indeed, in one case, the § 851 notice was not waived where a defendant pled, cooperated, was given a U.S.S.G. § 5K1.1 motion, but not an 18 U.S.C. § 3553(e) motion, so that the defendant received the full brunt of the doubling of her mandatory minimum sentence, even though she was the least culpable defendant in a small methamphetamine conspiracy. She received the second longest sentence of any of her co-defendants. *United States v. Newhouse*, ___ F. Supp. 2d ___, 2013 WL 346432, *26, *30 (N.D. Iowa Jan. 30, 2013).

At long last, on August 12, 2013, Attorney General Holder issued his 2013 Memo establishing a national policy on charging mandatory minimum sentences and recidivist enhancements in drug cases. In pertinent part, the Holder 2013 Memo addressed § 851 enhancements, as follows:

> **Recidivist Enhancements**: Prosecutors should decline to file an information pursuant to 21 U.S.C. § 851 unless the defendant is involved in conduct that makes the case appropriate for severe sanctions. When determining whether an enhancement is appropriate, prosecutors should consider the following factors:
>
> - Whether the defendant was an organizer, leader, manager or supervisor of others within a criminal organization;
>
> - Whether the defendant was involved in the use or threat of violence in connection with the offense;
>
> - The nature of the defendant's criminal history, including any prior history of violent conduct or recent prior convictions for serious offenses;
>
> - Whether the defendant has significant ties to large-scale drug trafficking organizations, gangs, or cartels;
>
> - Whether the filing would create a gross sentencing disparity with equally or more culpable co-defendants; and
>
> - Other case-specific aggravating or mitigating factors.
>
> In keeping with current policy, prosecutors are reminded that all charging decisions must be reviewed by a supervisory attorney to ensure adherence to the Principles of Federal Prosecution, the guidance provided by my May 19,

2010 memorandum, and the policy outlined in this memorandum.

Holder 2013 Memo at 3.

### D.    *The Wheel of Misfortune*

The lack of any national or local policy, at least until August 12, 2013, rendered application of § 851 enhancements both whimsical and arbitrary—something akin to the spin of a "Wheel of Misfortune"—where similarly-situated defendants in the same district, before the same sentencing judge, sometimes received a doubling of their mandatory minimum sentences and sometimes did not.[10]   The same was true for similarly-situated defendants in the same district, before different judges, and similarly-situated defendants spanning the ninety-four districts.   Also, the opposite problem of unwarranted uniformity existed, where, owing to the absence of a national policy, the most objectively deserving defendants were never subject to an enhancement in the eight districts that never apply § 851 enhancements.   Given the arbitrary nature of § 851 enhancements, there were no assurances that the most objectively deserving defendants, nationwide, were actually the defendants receiving enhancements. Likewise, there were no assurances that the least deserving defendants, nationwide, were the ones that actually received a waiver.

The purpose of the Sentencing Reform Act of 1984 (SRA) was to

> [P]rovide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records . . . while maintaining sufficient flexibility to permit individualized sentences, where appropriate; and to "reflect, to the extent

---

[10] The role of Pat Sajak, from the classic television game show "Wheel of Fortune," is played, in this instance, by the DOJ Assistant Attorney General for the Criminal Division, and the wheel is spun not by contestants, but by the more than 4,500 Assistant U.S. Attorneys nationwide.

practicable, advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U. S. C. § 991(b)(1), Congress further specified four "purposes" of sentencing that the Commission must pursue in carrying out its mandate: "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed . . . correctional treatment." 18 U. S. C. § 3553(a)(2).

*Mistretta v. United States*, 488 U.S. 361, 374 (1989). The lack of a national, regional, intra-state, or local policy on § 851 enhancements rendered that stated purpose as illusory as David Copperfield's Vanishing Statue of Liberty.[11]

If humans continue to be involved in federal sentencing, there will always be some disparity. There was before the passage of the SRA, and there has been in each phase of the unfolding saga of federal Guideline sentencing.[12] The current most

---

[11] Kenneth R. Clark, *Magic on TV: Miss Liberty Vanishes Before Your Eyes*, PHIL. DAILY NEWS, Apr. 7, 1983, at 45.

[12] The Commission often refers to four time periods under the Guidelines:

> [T]he *Koon* period (June 13, 1996 through April 30, 2003), the PROTECT Act period (May 1, 2003 through June 24, 2004), the *Booker* period (January 12, 2005 through December 10, 2007), and the *Gall* period (December 11, 2007 through September 30, 2011). The Commission selected these periods based on Supreme Court decisions and legislation that influenced federal sentencing in fundamental ways. Specifically, in *United States v. Koon*, the Supreme Court defined the level of deference due to district courts' decisions to sentence outside the guideline range and determined that such decisions should be reviewed for abuse of discretion. In passing the PROTECT Act nearly seven years later, Congress restricted district courts' discretion to

popular gripe is that post *Booker* and *Gall*, federal judges create too much sentencing disparity in applying the 18 U.S.C. § 3553(a) factors.[13] Indeed, there is some disparity

---

> impose sentences outside the guideline range, and required that courts of appeals review such decisions de novo, or without any deference to the district court's decision. In Booker, the Supreme Court struck down two statutory provisions in the SRA that made the guidelines mandatory, and also defined the standard of review for sentences on appeal. In *Gall v. United States*, the Court further defined the appellate standard of review.

United States Sentencing Commission, REPORT ON THE CONTINUING IMPACT OF *UNITED STATES V. BOOKER* ON FEDERAL SENTENCING, Pt. A, pp.2-3 (Dec. 2012) (2012 *BOOKER* REPORT) (footnotes omitted).

[13] In a letter from the DOJ to the Commission, the DOJ voices concern for sentencing disparity, at least when created by others: "[T]hey involve the continuing erosion of the guidelines and increasing unwarranted disparities in sentencing within courthouses and across the country." The DOJ grudgingly recognized that sentencing disparities are driven by more than just judicial decision making, and they have often "written and spoken extensively about [their] concerns with reduced certainty and increased unwarranted disparities in sentencing." Jonathan J. Wroblewski, Director, Office of Policy and Legislation U.S. Department of Justice, *Letter from the DOJ to The Honorable Patti B. Saris, Chair*, at p.8 (July 11, 2013).

In the 2012 *BOOKER* REPORT, the Commission notes,

> The Commission's review of sentencing decisions suggests that judges view similar circumstances and weigh the section 3553(a) factors differently, in particular individual offender characteristics, much as they did during the years leading up to the SRA. In the wake of these changes, the Commission has observed both increasing inconsistencies in sentencing practices . . . and widening demographic differences in sentencing.

2012 *BOOKER* REPORT, 113.

because no two federal district court judges, over numerous cases, are likely to apply the Guidelines and the § 3553(a) factors in precisely the same way. Nevertheless, there is no unwarranted disparity because judges are applying congressionally-mandated factors and their decisions are subject to appellate review. Where there is now a national policy by the DOJ, with defined factors for the 94 U.S. Attorneys and the thousands of Assistant U.S. Attorneys to apply, I can accept that different federal prosecutors, like different federal judges, could, in the utmost good faith, apply the same factors differently and reach different results—that's what happens when individuals exercise judgment. What should be totally unacceptable and shocking to federal judges of all stripes, the DOJ, Congress, and the American public were the effects of a total lack of a national policy prior to August 12, 2013. What we had until then was a standardless Wheel of Misfortune regime.[14] The Commission's data and my experience illustrated the dangers of such a regime: Individual prosecutor's wholly-insulated § 851 charging decisions resulted in both unwarranted sentencing disparity and unwarranted sentencing uniformity—the worst case scenario imaginable.

### E. Other Problems With The Arbitrary Workings Of § 851 Enhancements

Wholly apart from these critical considerations of arbitrary application and lack of transparency by the DOJ, the serious and pervasive structural deficiencies in § 851 enhancements that existed prior to August 12, 2013, often led to bizarre and

---

[14] I had personally complained in writing to the highest levels of the DOJ about these concerns and was blown off with a perfunctory, brief letter, many months later, that read like a form letter in response to a consumer complaining that the sauce was too sour in a frozen entrée purchased at the local grocery store. It appeared to me that the DOJ had zero concerns about even examining this serious problem. The Holder 2013 Memo has restored my faith in the DOJ's recognition of and interest in resolving this problem.

incomprehensibly unfair results.[15]  For example, take two low-level drug addict co-defendants who, prior to August 12, 2013, pled guilty to and were sentenced for the same conspiracy to manufacture a small amount (as little as five grams) of homemade methamphetamine, made from cough medication purchased at a local drug store.  One was non-violent; the other had a long history of violence.  They were both fifty years old and lived next to each other, and both worked the night shift at a local manufacturing plant.  Bob had a thirty-year-old prior aggravated misdemeanor conviction in Iowa for possession of a small amount of marijuana.  In 1993, he paid a $100 fine, was given probation, never served a day in jail, and successfully completed his short term of probation.  He had no other prior convictions.  His co-defendant, John, had one prior armed robbery conviction in 2000, served an eight-year prison sentence, and violated his parole on several occasions before he was discharged in

---

[15] Scholars have criticized the effectiveness of recidivist enhancements like the § 851 enhancement.  Professor Russell notes,

> Empirical studies cast serious doubt on whether the rationales of sentencing—deterrence, incapacitation, retribution, and rehabilitation—support the magnitude of these federal enhancements. These studies suggest that longer prison terms do not significantly reduce recidivism and may even be counterproductive. Indeed, some studies suggest that alternatives to incarceration, such as drug treatment for repeat drug offenders, can be more effective than long prison terms at reducing recidivism and promoting public safety. . . .  Perhaps most significantly, there is clear evidence that enhancements based on prior drug convictions exacerbate racial disparities in the criminal justice system.

*Rethinking Recidivist Enhancements*, *supra*, n.9, at 1139 (footnotes omitted).  I have no position, and take no position, on these questions because these policy considerations about the general wisdom of recidivist enhancements like § 851 reside exclusively in the other two branches of government.

2011. John also had four assault convictions before his armed robbery conviction. John would likely have received a mandatory minimum five-year sentence, but because Bob's prior misdemeanor drug conviction is a predicate to a § 851 enhancement, and John's prior robbery and assault convictions are not, Bob would likely have received, at a minimum, the mandatory minimum sentence of ten years in a district where § 851 enhancements were routine. This was justice?[16] Indeed, a major drug trafficker in federal court would not receive a recidivist enhancement with a prior state court murder conviction, but a low-level drug addict would receive such an enhancement with a prior qualifying state court misdemeanor drug conviction. This was justice?

I am optimistic that fair application of the Holder 2013 Memo will rectify this problem going forward.

---

[16] In the parlance of Guideline calculations, both Bob and John would have had a base offense level of 26, based on the 5 grams of pure methamphetamine. They would each have received a 3-point reduction for acceptance of responsibility, have had no other guideline enhancements, and have had a total offense level of 23. Bob's prior state conviction would have been too old to count toward his criminal history, so Bob would have been a Criminal History I. His advisory Guideline range would have been 46 to 57 months, but his mandatory minimum, doubled from 60 months by a § 851 enhancement, would have been 120 months, 74 months above the low end of his Guideline range, because his prior state court aggravated misdemeanor drug conviction is treated as a felony for purposes of the § 851 enhancement. On the other hand, John would have been in Criminal History Category II, based on his armed robbery conviction, which scores 3 points, and no points for his 4 prior assault convictions, because they are more than 10 years old. None of John's prior 5 convictions count under § 851, so John would have received no enhancement. His final offense level would have been the same as Bob's and his advisory Guideline range would have been 51 to 63 months, but his mandatory minimum sentence would have been only 60 months.

## III.   ANALYSIS OF THE COMMISSION'S § 851 DATA

### A.   Overview Of The Underlying Data On § 851 Enhancements

The grim state of affairs for § 851 enhancements prior to the national policy established by the Holder 2013 Memo is starkly revealed by an examination of the Commission's § 851 data on the one occasion that it collected such information.  Every year, pursuant to its statutory mandate, the Commission publishes national data collected from federal sentencings spanning all ninety-four districts.[17]  In 2011, the Commission conducted the first and only, additional targeted coding and analysis project on nationwide application of 21 U.S.C. § 851 recidivist enhancements as part of the REPORT TO THE CONGRESS: MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM (Commission's 2011 REPORT).  Ninety-three of the ninety-four districts reported data, and the Commission described in detail its methodology for its targeted § 851 study.[18]  The Commission's 2011 REPORT itself notes, "[This] study

---

[17] 28 U.S.C. § 995(a)(13)-(16) (2012).

[18] The Sentencing Commission explains the methodology of the study, as follows:

> To better assess the application of these penalties, the Commission conducted a more targeted analysis of the nation-wide application of 21 U.S.C. § 851 by conducting a specialized coding and analysis project. Assessing whether an offender qualifies for an enhancement under § 851 requires analysis of two factors: 1) the instant offense of conviction under title 21, United States Code; and 2) prior qualifying drug convictions. Information about both factors can be determined objectively from the sentencing documents submitted to the Commission. Thus, evaluating whether § 851 enhancements are uniformly applied lends itself to quantitative analysis.

of drug offenses and mandatory minimum penalties demonstrates a lack of uniformity in application of the enhanced mandatory minimum penalties." Commission's 2011 REPORT at 253.

---

> The Commission used sample groups from three fiscal years (2006, 2008, and 2009) for the analysis. In all, 3,050 cases from fiscal year 2006, 5,434 cases from fiscal year 2008, and 5,451 cases from fiscal year 2009 were included in this analysis.
>
> Using these groups of cases, the Commission examined all the documents submitted for each case to ascertain whether the enhancement could have applied based on the offender's prior criminal history. To make this determination, the Commission examined each offender's criminal history for any prior conviction involving the distribution, manufacture, sale, possession with the intent to distribute, intent to manufacture, trafficking or importation or exportation of any controlled substances. The Commission also noted whether any such offenses were specifically identified as a felony and if so, included those cases in the analysis. For any drug offense not specifically identified as a felony, the Commission examined the sentence for the drug conviction to determine whether it exceeded 12 months. If so, the case was included in the analysis. Juvenile drug convictions were excluded from the analysis.
>
> Once the Commission concluded than an offender qualified for the enhancement, the Commission examined the documentation to ascertain whether the court had made any findings of fact relating to the enhancement. The Commission also attempted to determine whether the government had affirmatively agreed not to file the enhancement as part of plea negotiations.

Commission's 2011 REPORT at 253 – 255 (footnotes omitted).

Because the Commission's 2011 REPORT does not contain the raw data used for the § 851 analysis, I requested it directly from the Commission, and the Commission quickly responded by sending me the "851 datafile," which is contained in Appendix F. I then re-analyzed and reformatted the raw data in several significant ways that go far beyond the Commission's analysis. These data are presented in a variety of charts and graphs included in the text and appendices of this opinion.[19] All of the statistics used in the empirical analysis sections of this opinion (B-E) and in the appendices are drawn exclusively from the Commission's "851 datafile."[20] Sections B and C compare the

---

[19] *See* App. A for districts ranked by the rate at which § 851 enhancements are applied to eligible offenders; App. B for the disparity in intra-state application; App. C for a comparison of districts in the Eighth Circuit; App. D for intra-circuit disparity and averages; and App. E for all information on districts listed alphabetically.

[20] Notes on the Commission's data are as follows:

> The fiscal year 2006 sample was randomly selected from the Commission's fiscal year 2006 datafile and comprises cases that were sentenced after June 6, 2006. The Commission selected offenders in cases where the enhancement was documented as part of the conviction or in cases sentenced under USSG §§ 2D1.1 or 2D1.2 and where the offenders previous criminal history included a drug offense.

> Mandatory Minimum Penalties in the fiscal year 2008 and 2009 samples were randomly selected from cases with complete guideline application information sentenced in the third and fourth quarters of those fiscal years. From this sample group, the Commission selected cases with the enhancement documented as a states of conviction, or with offenders with previous criminal history and sentenced under U.S.S.G. §§ 2D1.1 or 2D.1.2.

> Although some federal circuit courts have held that juvenile felony drug convictions qualify for enhancement

under section 841(b), the Commission excluded juvenile predicate convictions from the analysis of offenses eligible for enhancement because presentence reports sometimes fail to specify whether a defendant was certified as an adult notwithstanding the fact that he or she was under the age of majority under state law. Moreover, although some federal courts have broadly interpreted section 802(44) to include convictions for offenses "related to" drugs, such as use of a telephone to facilitate drug trafficking, the Commission only included felony convictions for drug distribution manufacture, possession, and similar drug offenses.

An important limitation on the Commission's coding project concerning enhancements for prior convictions for felony drug offenses under § 841(b) should be noted. Under 18 U.S.C. § 802(44), a "felony drug offense" includes simple possession of a controlled substance that is punishable in excess of one year in prison even if such an offense is not labeled as a "felony" offense under other relevant state law. Such predicate convictions for simple possession thus can include cases in which an offender was sentenced to a year or less in prison or sentenced to probation. In reviewing the criminal history sections of presentence reports in order to determine whether an offender was eligible for enhancement under § 851 based on a prior conviction for simple possession of a controlled substance, the Commission often could not ascertain whether prior conditions receiving sentences of one year or less (including probationary sentences) were "punishable" in excess of one year in prison under state law. For that reason, the Commission only included convictions for simple possession that received prison sentences for more than one year in order to ensure that such convictions were in fact felonies. This approach likely was under-inclusive insofar as it did not include certain prior convictions that were eligible for enhancement under § 851.

Commission's 2011 REPORT at 254 nn.696-699. Data was unavailable for the district of the Northern Mariana Islands.

application of § 851 enhancements in the N.D. of Iowa to national statistics and the Eighth Circuit respectively. Section D examines disparity that can be found within circuits, and Section E shows a lack of uniformity even in multi-district states. All statistics in the text of the opinion are rounded to whole numbers, and figures in the footnotes and appendices are calculated to two decimal places.

### B. Northern District Of Iowa - § 851 Application Disparity

The N.D. of Iowa ranks fourth in the nation in its use of § 851 enhancements (79% of eligible defendants received a § 851 enhancement), trailing only the S.D. of Iowa (84%), N.D. of Florida (87%), and Guam (100%, but only three eligible defendants). App. A. Prosecutors in the N.D. of Iowa applied this enhancement at a rate more than six times the national median application rate (13%) and more than three times the national average application rate (26%).[21] Compared to the national median application, eligible offenders in the N.D. of Iowa are 626%[22] more likely to be subject to a § 851 enhancement and, compared to the national application average, eligible offenders are 311% more likely to receive a § 851 enhancement. The mode, or most common application rate, nationally, was 0%. Apps. A, E. The application rate for the N.D. of Iowa in the national context is shown, just below, in Figure 2E.

---

[21] App. E (national median of application rate is 12.63%).

[22] N.D. of Iowa's 79.25% application rate divided by the national average application rate of 26.17%. App. E.

## N.D. of Iowa Compared to National § 851 Enhancement Statistics



Figure 1E

Of the ninety-three reporting districts, sixty have an application rate of 25% or less. This data is presented in Figure 2A, just below. *See* App. A.

### Districts' Application Rate by Quartile



Figure 2A

Only seven districts applied the enhancement in over two-thirds of eligible cases. *Id*. Nationally, eight districts (Arizona, W.D. of Arkansas, Colorado, Louisiana, N.D. of Mississippi, S.D. of Ohio, E.D. of Oklahoma, and the Virgin Islands) never enhanced a single eligible defendant.[23] The N.D. of Iowa's 79% rate is greater than all of the following twenty-nine districts COMBINED: Maryland, N.D. West Virginia, E.D. Texas, N.D. California, New Jersey, E.D. Arkansas, S.D. West Virginia, S.D. Mississippi, South Dakota, New Mexico, W.D. Missouri, Nebraska, M.D. Pennsylvania, W.D. Washington, Oregon, M.D. Georgia, W.D. Tennessee, Puerto Rico, S.D. California, N.D. Texas, Arizona, W.D. Arkansas, Colorado, M.D. Louisiana, N.D. Mississippi, S.D. Ohio, E.D. Oklahoma, and the Virgin Islands. App. A. Eligible offenders in the N.D. of Iowa face a 271% increased likelihood of

---

[23] App. E. (84 eligible defendants in Arizona, 18 in W.D. of Arkansas, 26 in Colorado, 15 in Louisiana, 17 in N.D. of Mississippi, 62 in S.D. of Ohio, 6 in E.D. of Oklahoma, and 4 in the Virgin Islands were not charged with § 851 enhancements in the Commission's sample analysis).

receiving a § 851 enhancement compared to the average application rate in the Eighth Circuit. The Eighth Circuit disparity is discussed in the next sub-section.[24]

### C.    The Eighth Circuit – § 851 Application Disparity

The average application rate of § 851 enhancements for districts in the Eighth Circuit is 28%. App. D. The application rates in the Eighth Circuit range from 84% in the S.D. of Iowa, to 0% in the W.D. of Arkansas. *Id.* Of the ten districts in the Eighth Circuit, Iowa's two districts are responsible for enhancing the sentences of 63% of the eligible offenders. Table 1C, below, shows the total number of defendants sentenced for drug offenses in each district, the number and percentage of those defendants who were eligible for a § 841 enhancement, the number and percentage of eligible defendants who actually received a § 841 enhancement, the number of eligible defendants for whom a § 851 enhancement was waived, and the intra-state discrepancy in application of § 851 enhancements among districts. Figure 1C, also below, then shows, in a bar graph for easy comparison, the number of defendants in each district who were eligible for but *did not* receive § 851 enhancements compared to those who were both eligible for and *did* receive § 851 enhancements.

---

[24] App. D. (N.D. of Iowa had a 79.25% application rate divided by the national average application rate of 26.17% and the Eighth Circuit average application rate of 28.27%).

| District | Total | Eligible | Eligible / Total | Enhanced | Enhanced / Eligible | Eligible - Enhanced | Intra-state discrepancy |
|---|---|---|---|---|---|---|---|
| Iowa, S | 149 | 73 | 48.99% | 61 | 83.56% | 12 | 4.32% |
| Iowa, N | 107 | 53 | 49.53% | 42 | 79.25% | 11 | |
| Missouri, E | 286 | 147 | 51.40% | 15 | 10.20% | 132 | 35.37% |
| Missouri, W | 191 | 79 | 41.36% | 36 | 45.57% | 43 | |
| Minnesota | 211 | 80 | 37.91% | 6 | 7.50% | 74 | |
| Nebraska | 219 | 64 | 29.22% | 2 | 3.13% | 62 | |
| Arkansas, E | 86 | 40 | 46.51% | 2 | 5.00% | 38 | 5.00% |
| Arkansas, W | 43 | 18 | 41.86% | 0 | 0.00% | 18 | |
| N. Dakota | 57 | 27 | 47.37% | 12 | 44.44% | 15 | |
| S. Dakota | 75 | 25 | 33.33% | 1 | 4.00% | 24 | |

Table 1C

§ 851 Enhancement Application or Waiver in the Eighth Circuit's Districts



Figure 1C

Prosecutors in the N.D. of Iowa applied this enhancement at a higher rate than all other districts in the Eighth Circuit except the S.D. of Iowa. Iowa's two federal district applied the § 851 enhancement to more defendants than the rest of the districts in the Eighth Circuit combined. App. D. The N.D. of Iowa alone, applied the § 851 enhancement at a rate more than twice the amount of six other districts in the Eighth Circuit combined.[25] Eligible defendants in the N.D. of Iowa were 1,183% more likely to receive at least a § 851 enhancement than the average of other districts in the Eighth Circuit excluding the S.D. of Iowa. App C.

Although the N.D. and S.D. of Iowa differ in application by only five percentage points, the difference that geography can make in sentencing becomes apparent when the N.D. of Iowa is compared to the three federal districts, other than the S.D. of Iowa, that border the N.D. of Iowa. Apps. C, D. Nebraska is only one mile south of the federal courthouse in Sioux City, Iowa, where I preside, yet defendants are 2,532% more likely to face a § 851 enhancement in the N.D. of Iowa than in the D. of Nebraska. Ironically, a very significant percentage of my drug cases, including those where a § 851 enhancement is applied, could have been venued and prosecuted in Nebraska.[26] The South Dakota border is four miles to the west, but federal prosecutors in the D. of South Dakota apply the enhancement at one-twentieth the rate federal prosecutors apply it in the N.D. of Iowa. App. C. Defendants in

---

[25] The six districts are Minnesota, E.D and W. D. of Arkansas, Nebraska, South Dakota, and the W.D. of Missouri.

[26] Virtually all of my drug cases are conspiracy cases and most have several overt acts, if not the locus of the conspiracy, in South Sioux City, Nebraska. Because the Tri-State Drug Task Force, made up of law enforcement personnel from Nebraska, South Dakota, and Iowa is located in Sioux City, Iowa, the agents prefer filing the cases here to avoid the 200 mile round-trip to the federal courthouse in Omaha, Nebraska.

Minnesota, an hour-and-a-half drive to the north, were less than one-tenth as likely to be subjected to a § 851 enhancement as defendants in the N.D. of Iowa. Figure 5C, below, illustrates the rate of application of § 851 enhancements in the N.D. of Iowa compared to its neighbors, and Figure 2C, below, shows the percentage of increased likelihood of application of § 851 enhancements in the N.D. of Iowa compared to selected Eighth Circuit districts. App. C.

## Frequency Of § 851 Enhancement Application In Selected Adjacent Districts



Figure 5C

## Increased Likelihood of Enhancement in the N.D. Iowa
## Compared to Districts in the Eighth Circuit*



Figure 2C

*Excluding the W.D. of Arkansas's 0% application rate and the S.D. of Iowa. The N.D. of Iowa applies the enhancement at 95% the rate of the S. D. of Iowa

### D. Intra-circuit – § 851 Application Disparity

In each circuit, I took the district with the highest § 851 application rate (strictest) minus the district with the lowest application rate (most lenient) to determine the circuit range. The average intra-circuit range for all circuits is 59 percentage points. App. D. This average indicates that, out of every five defendants to whom an § 851 enhancement was applied in the strictest district in that circuit, three of those defendants in the most lenient district in that circuit did not receive the enhancement.[27] Not surprisingly, the average application rate for each circuit is largely in line with the national average.[28] Notable deviations from this standard, however, can be found in the circuits that sandwich my own: The prosecutors in districts in the Tenth Circuit stingily file the information required for the enhancement in only 9% of eligible cases, but the prosecutors in districts in the Seventh Circuit average application rate of 40% provides a spectrum ending with leniency to the west.

The Eleventh Circuit's districts have an average enhancement application rate of 38%, while the adjacent Fifth Circuit averages only 17%. *Id.* The Eleventh Circuit has the largest intra-circuit disparity of 85%; curiously, two adjacent districts provide this extreme range. Prosecutors in the N.D. of Florida opted to at least double the sentences of 60 of 69 eligible offenders over the sample period, yielding an 87% application rate. Just across the border in the M.D. of Georgia, in contrast, there were 52 eligible offenders, but prosecutors deemed only 1 warranted such a severe

---

[27] This statistic was calculated by averaging the ranges of each of the eleven districts, excluding Guam as an outlier, where the § 851 enhancement was applied in all three eligible cases over the sampled period for the Commission's "851 datafile." App. D.

[28] *Id.* (Eighth Circuit average application is 28.27%) and App. E (national average application is 26.17%).

enhancement, resulting in just a 2% application rate. This means that offenders charged in the N.D. of Florida are 4,529% more likely to receive at least double the time that a similarly-situated defendant just to the north, in the M.D. of Georgia, would receive.[29] The S.D. of Florida (including Miami) applied this enhancement only 14% of the time, less than one-sixth the rate of the N.D. of Florida. *Id*. The N.D. of Florida applied the § 851 enhancement at a rate equivalent to that of thirty other districts combined. App. A. Defendants in the N.D. of Georgia faced enhanced sentences at a rate almost twenty-five times greater than defendants in the M.D. of Georgia.[30] The Eleventh Circuit's extreme 85% variance in range is not the result of a single outlying district, but more often two districts in the same state will have widely different application rates. Examples are the following: Alabama—with the N.D.'s application rate of 75% compared to the M.D.'s application rate of 44%; Florida—with the N.D.'s application rate of 87% compared to the S.D.'s application rate of 14%; Georgia—with the N.D.'s application rate of 48% compared to the M.D.'s application rate of 2%. *Id*. Figure 1D, below, illustrates the ranges and averages of each circuit. The impact of the figure may be lost, because almost every circuit achieves an almost 50% range in applications between its extreme districts.[31]

---

[29] *Id*. (N.D. of Florida application rate is 86.96% divided by the M.D. of Georgia's application rate of 1.92%).

[30] *Id*. (M.D. of Georgia has a 1.92% application rate and the N.D. of Georgia has a 47.50% application rate, 24.7 times as high.)

[31] *Id*. at Figure 1D.



**Range and Average of § 851 Enhancement Application to Eligible Offenders by Circuit***

Figure 1D

*The D.C. Circuit's average application rate is 18%

36

## E.    Intra-state And National – § 851 Application Disparity

Five states (Arkansas, Louisiana, Mississippi, Ohio, and Oklahoma) have one district that never enhanced sentences using § 851, but has another district that did apply the enhancement.  That is hardly the most striking intra-state disparity, in terms of a particular defendant's likelihood of a § 851 enhancement in one district in a state, as compared to other districts in that state, however, because Arkansas, Mississippi, and Oklahoma have such low percentages of enhanced defendants versus eligible defendants.  More striking is Louisiana's intra-state disparity of 57% and Ohio's intra-state disparity of 58%.  The average disparity among these five states is 28%.  App. B.

Aside from the five states with a district with no § 851 enhancements, Tennessee offers the largest intra-state disparity in application.   In the E.D. of Tennessee, offenders are 3,994% more likely to receive a § 851 enhancement than in the W.D. of Tennessee.[32]  Offenders with a qualifying prior drug conviction in the W.D. of Texas were 2,585% more likely to have the Wheel of Misfortune land on a § 851 enhancement than their counterparts in the N.D. of Texas.[33]   Georgia offenders unfortunate enough to be charged in the N.D. faced a 2,470% greater likelihood of a § 851 enhancement than their brothers or sisters in the M.D. and 680% worse odds of a prosecutor not waiving the § 851 enhancement than eligible defendants in the S.D.[34] Apparently, Assistant U.S. Attorneys in the N.D. of Georgia are less persuaded by the

---

[32] App. D. (E.D. of Tennessee's 72.62% application rate divided by the W.D. of Tennessee's 1.82%).

[33] Id. (W.D. of Texas's 38.02% application rate divided by the N.D. of Texas's 1.47%).

[34] Id. (N.D. of Georgia's 47.50% application rate divided by M.D. of Georgia's 1.92%).

state motto: Wisdom, Justice, and Moderation. Flying back to the East Coast, the birthplace and signing place of the Declaration of Independence, Pennsylvanians have not seemed to benefit in equality from their noble heritage. The 2,257% increased opportunity for defendants in the E.D. of Pennsylvania to enjoy at least twice the amount of time in a federal penitentiary, compared to the unfortunately shortchanged offenders in the M.D. of Pennsylvania, where eligible defendants are stingily bequeathed § 851 enhancements only 2.5% of the time, is another prime example of gross disparity.[35]

Nationally, the districts at the extremes of the application rate show incredible disparity. While it may be unfair to compare Guam's 100% application rate to the 0% application rate in the Virgin Islands, because neither district has many eligible defendants,[36] the N.D. of Florida's 87% application rate provides a telling comparison to the 1% rate in the N.D. of Texas. The average application rate for the top ten districts is 76%,[37] but the average for the ten districts with the lowest application rate is less than 1%.[38] The average for the half of all districts with the strictest application

---

[35] *Id*. (E.D. of Pennsylvania's 57.14% application rate divided by M.D. of Pennsylvania's 2.53%).

[36] Guam and the Virgin Islands are the only two districts with ten or fewer total (eligible and ineligible drug defendants), and only three and four eligible defendants respectively. Given this small sample size, the comparison may be unfair.

[37] App. A (Guam at 100%, N.D. of Florida at 86.96%, S.D. of Iowa at 83.56%, N.D. of Iowa at 79.25%, C.D. of Illinois at 78.95%, N.D. of Alabama at 75.00%, E.D. of Tennessee at 72.62%, E.D. of Kentucky at 63.86%, S.D. of Illinois at 61.82%, N.D. of New York at 59.46%).

[38] *Id*. (S.D. of California at 1.53%, N.D. of Texas at 1.47%, Arizona at 0%, W.D. of Arkansas at 0%, Colorado at 0%, M.D. of Louisiana at 0%, N.D. of

rate is 44%, which is eight times higher than the 5% average application rate for the most lenient half of all districts. *Id.*

### F.  Summary

While the Commission's 2011 REPORT, itself, observed "a lack of uniformity in the application of the enhanced mandatory minimum penalties,"[39] my more probing analysis of the Commission's data establishes that this is a gross understatement. For unknown and unknowable reasons, federal prosecutors have been applying massive numbers of § 851 enhancements in many districts and not in others. For presumably other reasons, prosecutors in eight districts let their § 851 enhancement hammers gather dust over the three-year sampled period, never raising it against a single eligible defendant. No matter how this information is examined, inequity and the seemingly arbitrary practice of prosecutors prior to establishment of a national policy in the Holder 2013 Memo represented a Wheel of Misfortune approach to § 851 enhancements, resulting in shocking disparity among the nation's ninety-four districts. Whether the national policy in the Holder 2013 Memo will change this shocking disparity remains to be seen.

## IV.  THE ROLE OF THE JUDICIARY IN ATTEMPTING TO CORRECT THE PROBLEM

Congress has delegated § 851 enhancement decisions exclusively to federal prosecutors. Thus, the Commission, defendants, their counsel, and federal district and

---

Mississippi at 0%, S.D. of Ohio at 0%, E.D. of Oklahoma at 0%, and the Virgin Islands at 0%).

[39] Commission's 2011 REPORT at 253.

appellate court judges are powerless to do anything but complain about arbitrary application of § 851 enhancements.  Nevertheless, as Judge Calabresi recently penned,

> And yet, we judges have a right—a duty even—to express criticism of legislative judgments that require us to uphold results we think are wrong.  We may alert Congress to mistakes or gaps in its legislation. We may tell the legislature that we think a judgment it has made is mistaken, even absurd, and urge Congress to reconsider its judgment. We may even go further and suggest that a judgment made by the legislature is headed towards unconstitutionality. To do these things is not to "call the law into disrepute," but rather to work with coordinate branches of government to prevent disreputable laws from enduring.

*United States v. Ingram*, ___ F.3d ___, ___, 2013 WL 2666281, *14 n.9 (2nd Cir. June 14, 2013) (Calabresi, J. concurring) (footnotes and citations omitted).  I believe we have an equal right—even duty—to call out the DOJ on its application of the new national policy, its secrecy in applying § 851 enhancements, and the completely arbitrary way in which it could continue to apply these devastating enhancements, which add to the burdens of our Nation's mass incarceration problems,[40] in the absence

---

[40] The DOJ recently observed that in the last 20 years "the U.S. prison population exploded and overall criminal justice spending with it. For most of the country's history, imprisonment rates were stable at less than 150 persons per 100,000 in population. In the last several decades, though, the rate has more than quadrupled to over 700 per 100,000. Many have documented the impact that such imprisonment rates have had on individuals and communities, including the erosion of trust and confidence in criminal justice among many citizens, particularly in disadvantaged communities and communities of color." Jonathan J. Wroblewski, Director, Office of Policy and Legislation, *Letter from the Department of Justice to The Honorable Patti B. Saris, Chair, United States Sentencing Commission*, at 2-3 (July 11, 2013). Professor Sarah French Russell, in the context of a scholarly article on recidivist sentencing enhancements has observed:

Eliminating federal enhancements based on prior drug convictions, or at least decreasing the magnitude of these enhancements, would also go a long way towards reducing the federal prison population. During the past twenty-five years, the federal prison population has grown by more than 500%. Indeed, although the growth of the prison population has slowed in some states and even declined in a few, the federal prison population continues to expand rapidly. The majority of federal prisoners are serving sentences for drug offenses. The large size of the federal prison population is due in substantial part to the impact that prior drug convictions have on federal sentences.

*Rethinking Recidivist Enhancements*, *supra*, n.9, at 1232 (footnotes omitted).

On August 1st of this year, in a joint press release announcing the introduction of their bipartisan Smarter Sentencing Act, Senators Durbin and Lee stated:

With federal prison populations skyrocketing and nearly half of the nation's federal inmates serving sentences for drug offenses, Assistant Majority Leader Dick Durbin (D-IL), Senator Mike Lee (R-UT) have introduced the Smarter Sentencing Act, to modernize our drug sentencing polices by giving federal judges more discretion in sentencing those convicted of non-violent offenses. Making these incremental and targeted changes could save taxpayers billions in the first years of enactment.

"Mandatory minimum sentences for non-violent drug offenses have played a huge role in the explosion of the U.S. prison population," Durbin said. "Once seen as a strong deterrent, these mandatory sentences have too often been unfair, fiscally irresponsible and a threat to public safety. Given tight budgets and overcrowded prison cells, judges should be given the authority to conduct an individualized review in sentencing certain drug offenders and not be bound to outdated laws that have proven not to work and cost taxpayers billions."

"Our current scheme of mandatory minimum sentences is irrational and wasteful," Lee said. "By targeting particularly egregious mandatory minimums and returning discretion to federal judges in an incremental manner, the Smarter Sentencing Act takes an important step forward in reducing the financial and human cost of outdated and imprudent sentencing polices."

The United States has seen a 500 percent increase in the number of inmates in federal custody over the last 30 years, in large part due to the increasing number and length of certain federal mandatory sentences. Mandatory sentences, particularly drug sentences, can force a judge to impose a one-size-fits-all sentence without taking into account the details of an individual case. Many of these sentences have disproportionately affected minority populations and helped foster deep distrust of the criminal justice system.

This large increase in prison populations has also put a strain on our prison infrastructure and federal budgets. The Bureau of Prisons is nearly 40 percent over capacity and this severe overcrowding puts inmates and guards at risk. There is more than 50 percent overcrowding at high-security facilities. This focus on incarceration is also diverting increasingly limited funds from law enforcement and crime prevention to housing inmates. It currently costs nearly $30,000 to house just one federal inmate for a year. There are currently more than 219,000 inmates in federal custody, nearly half of them serving sentences for drug offenses.

*Durbin and Lee Introduce Smarter Sentencing Act*, WEBSITE OF DICK DURBIN, US SENATOR FOR ILLINOIS, ASSISTANT MAJORITY LEADER (August 1, 2013), http://www.durbin.senate.gov/public/index.cfm/pressreleases?ID=be68ad86-a0a4-486-853f-f8ef7b99e736.

of new transparency accompanying the new policy. I believe that the judiciary has a continuing obligation to pressure the DOJ to make public the basis for specific § 851 enhancement decisions. For example, AUSAs could state on the record how the decision to impose a § 851 enhancement in a particular case complies with the Holder 2013 Memo. To the extent that AUSAs might invoke a deliberative process privilege for such decisions, I urge them to waive it, in the greater interest of transparency and fairness, so that presiding judges can tell if they are complying with the Holder 2013 Memo, even if judges ultimately can do nothing more than complain about arbitrary or noncompliant application.

The DOJ could easily do these things, if it wanted, to become less arbitrary, more transparent, or both, to demonstrate its compliance with the new national policy for § 851 enhancements. I respectfully request that the DOJ consider doing so.

## V.  THE DOJ, THE AUDACITY OF HYPOCRISY, AND THE OPPORTUNITY FOR ATONEMENT

The SRA requires the Criminal Division of the DOJ to submit to the Commission, at least annually, a report commenting on the operation of the sentencing guidelines, suggesting changes to the guidelines that appear to be warranted, and otherwise assessing the Commission's work. 28 U.S.C. § 994(o) (2006). On July 11, 2013, the DOJ did just that, writing: "We are pleased to submit this report pursuant to the Act. The report also responds to the Commission's request for public comment on its proposed priorities for the guideline amendment year ending May 1, 2014. *Notice of Proposed Priorities and Request for Public Comment*, 78 Fed. Reg. 32,533 (May 30, 2013)." Jonathan J. Wroblewski, Director, Office of Policy and Legislation U.S. Department of Justice, *Letter from the DOJ to The Honorable Patti B. Saris, Chair*, at p.1 (July 11, 2013).

The Report is replete with references to the DOJ's deep concern for sentencing disparity, at least when created by others, and for greater justice for all:

- "Together, we must reform federal sentencing policy in the months ahead so that federal criminal justice . . . can contribute to greater justice for all." *Id*. at 1.

- "It was thought that certainty in sentencing . . . also increase[s] fairness in sentencing by reducing unwarranted sentencing disparities." *Id*. at 2.

- "[T]here is much more that can and must be done to ensure Equal Justice Under Law for all." *Id*. at 3.

- "While we are concerned about increased sentencing disparities. . . ." *Id*. at 8.

- "And we further believe that much can be learned from the states, including how to . . . reduce unwarranted sentencing disparities, and better allocate sentencing decisions among the stakeholders in the criminal justice system." *Id*. at 9.

- "Given new and emerging crime challenges . . . and the growing disparities of the post-*Booker* sentencing system, we think it is time for reform." *Id*. at 9-10.

In contrast to these stated concerns about sentencing disparities, the statistical information presented in this opinion, drawn directly from the Commission's data, conclusively establishes that, at least prior to the statement of a national policy in the Holder 2013 Memo, there was a breathtaking disparity in the DOJ's own application of § 851 enhancements. This dramatic sentencing disparity created, implemented, and ignored by the DOJ, did as much or more to create unwarranted and arbitrary sentencing disparities as any other source I am aware of. It has added thousands of years of arbitrarily inflicted incarceration on drug defendants, most of whom are non-

violent drug addicts, based on the absence of a DOJ national policy informed by reasonable factors. The DOJ either had the data about application of § 851 enhancements and not only ignored it, but hid it from the public, or never bothered to gather such data, which was grossly negligent. Either way, allowing this disparity to persist for so long was a terrible abuse of the public trust.

There is much that the DOJ could do to atone for its creation of such arbitrary disparities. First, while the DOJ criticizes others for creating unwarranted sentencing disparity, it ought to give serious consideration to ending or at least narrowing its self-generated § 851 disparity—and it has taken a dramatic first step to do so with the Holder 2013 Memo. Second, now that the DOJ has a national policy for § 851 enhancements, in the interest of transparency, it should examine the pros and cons of adding to the policy requirements that AUSAs state on the sentencing record why a § 851 notice is applied or waived in particular cases. Finally, publishing prosecutorial policies on § 851 enhancements by individual districts and nationally, with an explanation of how those policies interpret and apply the policy stated in the Holder 2013 Memo, with the relevant statistical data about eligibility and application by the DOJ, would enable the best practices to surface in sunlight rather than secrecy. Transparent policies and data would be reviewable by defendants, government lawyers, defense lawyers, the Commission, and the courts. Such transparency would enable the Commission to develop statistics on the following: (1) data determining whether § 851 was being applied without the current arbitrariness, and (2) recidivist rates of those receiving § 851 enhancements. This would lead to a greater understanding of the efficacy of recidivist sentencing enhancements and facilitate the evolution of sensible, evidence-based policies by Congress, the Commission, and the DOJ.[41]

_____

[41] It would also allow the Commission and the DOJ to analyze whether current claims that the DOJ's § 851 application has or continues to discriminate against racial

One hopeful sign that the DOJ is willing to address the problem openly came from the August 12, 2013, remarks of Attorney General Eric Holder to the American Bar Association. In those remarks, Attorney General Holder observed, *inter alia*, that the DOJ, attorneys, and judges must "fundamentally rethink[ ] the notion of mandatory minimum sentences for drug-related crimes," although there was no specific mention of § 851 enhancements in that address, even though such enhancements have had such a dramatic effect on mandatory minimum sentences.[42] The Holder 2013 Memo, disseminated the same day, indicates that the DOJ has moved beyond "fundamental rethinking" to promulgation of a new policy on mandatory minimum sentences, specifically addressing § 851 enhancements.

Much will turn, however, on how the rather vague guiding factors in the Holder 2013 Memo are interpreted and applied by the DOJ generally and by individual United States Attorneys and whether additional guidance from the DOJ is provided. For example, the factor requiring consideration of "[t]he nature of the defendant's criminal history, including any prior history of violent conduct or recent prior convictions for

---

minorities are true. *See, e.g., Rethinking Recidivist Enhancements*, *supra*, at n.9, at 1169. "[T]he § 851 enhancement furthers racial disparities." Lynn Adelman, *What the Sentencing Commission Ought to be Doing: Reducing Mass Incarceration*, 18 MICH. J. RACE & L. 295 (2013). Although the Commission's 2011 REPORT did little to highlight the disparities that have been my focus, it did observe that "[b]lack offenders qualified for the [§ 851] enhancement at higher rates than any other racial group." Commission's 2011 REPORT, 256; *see also id.* at 257, 261.

[42] Attorney General Holder, *Remarks At American Bar Association As Prepared For Delivery*, ABA (August 12, 2013), available at http://livewire.talking pointsmemo.com/entry/read-ag-eric-holders-remarks-at american-bar (last visited Aug. 13, 2013).

serious offenses" is quite broad.[43]  In my district, most of the § 851 enhancements have been based on state offenses designated aggravated misdemeanors, but treated as felonies under federal law.  Many of those state offenses are also very old, quite minor, and actually resulted in very light penalties, such as fines or probation, with no jail time, notwithstanding the potential for a sentence exceeding a year of imprisonment.  I question the wisdom of using such prior drug offenses as a basis for § 851 enhancements.  I believe that any consideration of "[t]he nature of the defendant's criminal history" should flag such prior drug offenses for special scrutiny, to ensure that application of a § 851 enhancement is appropriate on the basis of the specific prior drug offense, as well as in light of other factors identified in the Holder 2013 Memo.

Finally, when I showed the AUSA in this case some of the evidence of disparities in the application of § 851 enhancements in this district compared to neighboring districts—presented above—during Young's sentencing hearing, the AUSA admitted that he had not seen such information.  He also stated that he had only known, from contact with individual AUSAs in neighboring districts that, for example, the D. of Nebraska rarely imposed § 851 enhancements unless a defendant actually went to trial.  He stated that he was "a little bit shocked that [neighboring districts] don't hardly ever apply [§ 851 enhancements] based on what they—what I've heard in talking to them.  But again, I didn't pull the statistics.  They are new to me."  Sentencing Hearing, Real Time Transcript.  On the other hand, he was only "surprised" at the extent of the disparities.  Specifically, he said, "I don't know if shock's the right word because—but yes, it surprises me to see that kind of difference in how they are applying [§ 851] and how we are applying it."  *Id.*  He also stated that he could not comment on the reasons for such disparities without reviewing more information about the

---

[43] *See, supra*, p. 15 (quoting the "Recidivist Enhancements" section of the Holder 2013 Memo).

disparities and the policies in the various districts, but he did admit that the existence of such disparities "certainly raises some questions." *Id.*

The comments of this AUSA, who is a very experienced prosecutor in this district and one whom I believe operates in absolute good faith, demonstrate that the DOJ never provided the information about the disparities in § 851 enhancements to prosecutors in the field nor provided any direction to them on how to apply such enhancements, which might have helped remedy the disparities. I do not blame this AUSA for either the disparities or his lack of knowledge about them; rather, it is clear that there has been a failure at the higher levels of the DOJ to make even its own prosecutors aware of the problem or to address it. The DOJ has had the pertinent information since the Commission's 2011 REPORT, but apparently did nothing with it until just this week, when it disseminated the Holder 2013 Memo. This secrecy and inaction is extremely disappointing and raises serious concerns about how the DOJ and prosecutors in individual districts will handle § 851 enhancements going forward, even with the Holder 2013 Memo in place.

Again, I am optimistic that fair application of the Holder 2013 Memo will rectify this problem going forward. Of course, if all § 851 enhancement decisions are still made in secret, no reasons for such decisions in particular cases are ever announced, tracked, or published by the DOJ, and no nationwide statistics are kept and made public by the DOJ or the Commission on circumstances in which § 851 enhancements are imposed, we will never know if the Holder 2013 Memo has effectively eliminated intra-state, intra-Circuit, or other regional or national disparities in the application of § 851. Instead, we will still have only anecdotal experiences with the application—or lack of application—of § 851 enhancements. In the absence of such efforts at tracking, analyzing, and disseminating information about § 851 enhancements, I have little faith

that the Holder 2013 Memo will actually remedy the gross disparities apparent in past applications of such enhancements.

## VI.    CONCLUSION

The massive disparity in eligibility and application of § 851 notices prior to the promulgation of a national policy in the Holder 2013 Memo is deeply disturbing, as is the incredible cloak of secrecy in which these decisions were made.   Unfortunately, judges have done very little, if anything, to call this to the attention of the DOJ.   That failing is due, in large part, to the lack of dissemination to judges of statistics about this problem.   Enhancements for recidivism have been part of the statutory sentencing arsenal for drug crimes at least since the 1964 amendments to the Narcotic Drug Import and Export Act of 1958, and the Federal Sentencing Guidelines and the Commission have been in place since 1987, yet until the Commission's study and 2011 REPORT, there was simply no way to determine what disparities application of § 851 was creating—and the data from the Commission's 2011 REPORT, using sample groups from three fiscal years (2006, 2008, and 2009), is now aging.   The lack of information about the problem is why I have undertaken to obtain and analyze the only known data on the subject.[44]   I call on my colleagues on the federal bench to express their continuing concerns to the DOJ about application of § 851 enhancements and implementation of the national policy in the Holder 2013 Memo.

Admittedly, the DOJ has a very full plate.   The Office of Inspector General of the DOJ recently submitted a statutorily-required list of top management and

---

[44] I commend the Commission for its willingness to respond fully and promptly to my various requests for data.

performance challenges facing the DOJ dated November 7, 2012.[45]  It listed and discussed ten extremely important matters:  (1) Safeguarding National Security, (2) Enhancing Cyber Security, (3) Managing the Federal Prison System, (4) Leading the Department in an Era of Budget Constraints, (5) Protecting Civil Rights and Civil Liberties, (6) Restoring Confidence, (7) Coordinating Among Law Enforcement Agencies, (8) Enforcing Against Fraud and Financial Offenses, (9) Administering Grants and Contracts, and (10) Ensuring Effective International Law Enforcement. These are all extremely important matters.  But so too are the thousands of extra months inmates are serving solely as a result of the DOJ's continued lack of transparency, prior lack of a coherent policy, and prior and potentially continuing arbitrary application of § 851 enhancements.  I congratulate Attorney General Holder and the DOJ for making § 851 enhancements a priority in the policy changes established in the Holder 2013 Memo.

In testimony before the U.S. Senate Committee on the Judiciary Subcommittee on Crime and Drugs, then Assistant Attorney General Lanny A. Breuer of the Criminal Division of the DOJ testified:

> Ensuring fairness in the criminal justice system is also critically important. Public trust and confidence are essential elements of an effective criminal justice system – our laws and their enforcement must not only be fair, but they must also be perceived as fair. The perception of unfairness undermines governmental authority in the criminal justice process. It leads victims and witnesses of crime to think twice before cooperating with law enforcement, tempts jurors to ignore the law and facts when judging a criminal

---

[45] Michael E. Horowitz, Inspector General, *Top Management and Performance Challenges in the Department of Justice–2012*, at 1 (Nov. 7, 2012) available at http://www.justice.gov/oig/challenges/2012.htm (last viewed Aug. 13, 2013).

> case, and draws the public into questioning the motives of
> governmental officials.[46]

The Holder 2013 Memo holds out hope that the DOJ will follow its own Congressional testimony by trying to eliminate the hidden yet massive injustice created by prior application of § 851 enhancements. The dramatic failure of the DOJ, prior to the Holder 2013 Memo, to publicly acknowledge and take steps to reduce the national disparity in the application of § 851 enhancements diminished judicial and public trust and confidence in both the DOJ and the federal criminal justice system. It not only created a perception of injustice, it actually perpetuated a gross injustice and "dr[ew] the public into questioning the motives of governmental officials." *Id*. Let us hope that the new national policy on § 851 enhancements will undo some of that damage.

We as judges can and should do more. While we still cannot require AUSAs to state on the record how they have applied the § 851 policy, we can certainly request that they do so. The same is true with asking, on the record, what factors an AUSA considered in deciding to apply or waive the § 851 enhancement. We can also ask if the AUSAs are aware of and have studied the Commission's data on § 851 enhancements. We can further probe if the DOJ has any plans to make public the impact of the new national policy on reducing the massive and unwarranted sentencing disparities former application of § 851 enhancements had created.

Finally, it is vitally important to remember that defendants subject to the § 851 enhancements are real people and members of our communities, not contestants on a game show. While they may cross their fingers and hope the winds of change that have blown a new, national § 851 policy onto our shores will blow in their favor, the most

---

[46] *Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity*, *before the U.S. Sen. Comm. on the Judiciary, Subcomm. on Crime and Drugs*, 111th Cong. 101 p.1 (Apr. 29, 2009) (Statement of Lanny A. Breuer, Assistant Att'y Gen., Crim. Div., U.S. Dep't of Justice).

important factor for the length of their sentences should not be which prosecutor the tic, tic, tic, tic of the Wheel of Misfortune chooses for them.

THEREFORE, upon consideration of all relevant factors, defendant Douglas Young was sentenced to 24 months of incarceration followed by 4 years of supervised release on each count, to run concurrently, with certain other conditions as stated on the record.

**IT IS SO ORDERED**.

**DATED** this 16th day of August, 2013.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

Appendix A

Table 1A

| | Rank | District | Enhanced /Eligible |
|---|---|---|---|
| | 1 | Guam | 100.00% |
| | 2 | Florida, N | 86.96% |
| | 3 | Iowa, S | 83.56% |
| | 4 | Iowa, N | 79.25% |
| | 5 | Illinois, C | 78.95% |
| | 6 | Alabama, N | 75.00% |
| | 7 | Tennessee, E | 72.62% |
| | 8 | Kentucky, E | 63.86% |
| *Top 10%* | 9 | Illinois, S | 61.82% |
| | 10 | NY, N | 59.46% |
| | 11 | SC | 57.97% |
| | 12 | Ohio, N | 57.83% |
| | 13 | Louisiana, W | 57.14% |
| | 14 | PA, E | 57.14% |
| | 15 | Montana | 54.84% |
| | 16 | Hawaii | 52.38% |
| | 17 | Indiana, S | 52.00% |
| | 18 | Delaware | 50.00% |
| | 19 | Massachusetts | 49.09% |
| | 20 | NC, W | 47.83% |
| | 21 | Georgia, N | 47.50% |
| | 22 | Missouri, E | 45.57% |
| | 23 | North Dakota | 44.44% |
| | 24 | Alabama, S | 44.00% |
| | 25 | NC, M | 42.86% |
| | 26 | Connecticut | 42.17% |
| | 27 | Alabama, M | 38.89% |
| | 28 | TX, W | 38.02% |
| | 29 | PA, W | 36.96% |
| | 30 | Michigan, E | 35.23% |
| | 31 | Virginia, W | 33.82% |
| | 32 | Louisiana, E | 32.69% |
| | 33 | Florida, M | 30.30% |
| | 34 | Wisconsin, W | 25.00% |
| | 35 | Wisconsin, E | 23.21% |
| | 36 | Kansas | 21.95% |
| | 37 | NY, W | 21.92% |
| | 38 | DC | 17.65% |
| | 39 | Rhode Island | 16.67% |

Appendix A

| Rank | District | Enhanced /Eligible |
|------|----------|-------------------:|
| 40 | NY, E | 16.39% |
| 41 | NY, S | 16.24% |
| 42 | Indiana, N | 15.22% |
| 43 | Florida, S | 13.67% |
| 44 | Wyoming | 13.64% |
| 45 | Utah | 13.33% |
| 46 | Idaho | 13.04% |
| 47 | Virginia, E | 12.63% |
| 48 | Alaska | 12.50% |
| 49 | Illinois, N | 11.63% |
| 50 | NH | 11.54% |
| 51 | TX, S | 11.22% |
| 52 | Michigan, W | 10.91% |
| 53 | CA, C | 10.77% |
| 54 | Washington, E | 10.71% |
| 55 | Maine | 10.00% |
| 56 | Oklahoma, W | 10.00% |
| 57 | Nevada | 9.52% |
| 58 | Kentucky, W | 9.43% |
| 59 | Tennessee, M | 8.70% |
| 60 | NC, E | 8.13% |
| 61 | CA, E | 8.06% |
| 62 | Vermont | 7.69% |
| 63 | Minnesota | 7.50% |
| 64 | Oklahoma, N | 7.14% |
| 65 | Georgia, S | 6.98% |
| 66 | Maryland | 6.93% |
| 67 | WV, N | 6.78% |
| 68 | TX, E | 5.88% |
| 69 | CA, N | 5.26% |
| 70 | NJ | 5.06% |
| 71 | Arkansas, E | 5.00% |
| 72 | WV, S | 4.88% |
| 73 | Mississippi, S | 4.17% |
| 74 | South Dakota | 4.00% |
| 75 | NM | 3.33% |
| 76 | Missouri, W | 3.13% |
| 77 | Nebraska | 3.13% |
| 78 | PA, M | 2.53% |
| 79 | Washington, W | 2.27% |
| 80 | Oregon | 1.96% |
| 81 | Georgia, M | 1.92% |
| 82 | Tennessee, W | 1.82% |
| 83 | Puerto Rico | 1.72% |

*Top 50%*

Appendix A

| Rank | District | Enhanced/Eligible |
|------|----------|-------------------|
| 84 | CA, S | 1.53% |
| 85 | TX, N | 1.47% |
| 86 | Arizona | 0.00% |
| 87 | Arkansas, W | 0.00% |
| 88 | Colorado | 0.00% |
| 89 | Louisiana, M | 0.00% |
| 90 | Mississippi, N | 0.00% |
| 91 | Ohio, S | 0.00% |
| 92 | Oklahoma, E | 0.00% |
| 93 | Virgin Islands | 0.00% |

**District Application Rate by Quartile**

Table 2A        Number of Districts

| | | |
|---|---|---|
| ≤25% | 60 | 64% |
| 25.1 - 49.9% | 15 | 16% |
| 50% - 74.9% | 12 | 13% |
| ≥75% | 6 | 7% |
| Districts* | 93 | 100% |

*N. Mariana Islands unreported

Figure 2A



≤25%
25.1 - 49.9%
50% - 74.9%
≥75%

Appendix A

## The N.D. Of Iowa's Application Rate Compared To Twenty-Nine Other Combined Districts

Table 3A

| | |
|---|---|
| N.D. Iowa | 79.25% |

| | |
|---|---|
| Maryland | 6.93% |
| WV, N | 6.78% |
| TX, E | 5.88% |
| CA, N | 5.26% |
| NJ | 5.06% |
| Arkansas, E | 5.00% |
| WV, S | 4.88% |
| Mississippi, S | 4.17% |
| South Dakota | 4.00% |
| NM | 3.33% |
| Missouri, W | 3.13% |
| Nebraska | 3.13% |
| PA, M | 2.53% |
| Washington, W | 2.27% |
| Oregon | 1.96% |
| Georgia, M | 1.92% |
| Tennessee, W | 1.82% |
| Puerto Rico | 1.72% |
| CA, S | 1.53% |
| TX, N | 1.47% |
| Arizona | 0.00% |
| Arkansas, W | 0.00% |
| Colorado | 0.00% |
| Louisiana, M | 0.00% |
| Mississippi, N | 0.00% |
| Ohio, S | 0.00% |
| Oklahoma, E | 0.00% |
| Virgin Islands | 0.00% |
| | |
| Total | 72.78% |

**Drug Offender 21 U.S.C. § 851 Enhancement By Intra-State Increased Percentage**
**Fiscal Year 2006, 2008, and 2009 Sample Groups**

Table 1B

| Increase Rank | Increased Percentage | District | Enhanced/ Eligible |
|---:|---:|---|---:|
| 1 | ∞ | Arkansas, E | 5.00% |
| | | Arkansas, W | 0.00% |
| 1 | ∞ | Louisiana, W | 57.14% |
| | | Louisiana, M | 0.00% |
| | | Louisiana, E | 32.69% |
| 1 | ∞ | Mississippi, S | 4.17% |
| | | Mississippi, N | 0.00% |
| 1 | ∞ | Ohio, N | 57.83% |
| | | Ohio, S | 0.00% |
| 1 | ∞ | Oklahoma, W | 10.00% |
| | | Oklahoma, E | 0.00% |
| | | Oklahoma, N | 7.14% |
| 2 | 3994.05% | Tennessee, E | 72.62% |
| | | Tennessee, W | 1.82% |
| | | Tennessee, M | 8.70% |
| 3 | 2585.63% | TX, W | 38.02% |
| | | TX, N | 1.47% |
| | | TX, E | 5.88% |
| | | TX, S | 11.22% |
| 4 | 2470.00% | Georgia, N | 47.50% |
| | | Georgia, M | 1.92% |
| | | Georgia, S | 6.98% |
| 5 | 2257.14% | PA, E | 57.14% |
| | | PA, M | 2.53% |
| | | PA, W | 36.96% |
| 6 | 1458.23% | Missouri, E | 10.20% |
| | | Missouri, W | 45.60% |
| 7 | 705.38% | California, C | 10.77% |
| | | California, S | 1.53% |
| | | California, E | 8.06% |
| | | California, N | 5.26% |
| 8 | 678.95% | Illinois, C | 78.95% |
| | | Illinois, N | 11.63% |
| | | Illinois, S | 61.82% |
| 9 | 676.87% | Kentucky, E | 63.86% |
| | | Kentucky, W | 9.43% |
| 10 | 636.16% | Florida, N | 86.96% |
| | | Florida, S | 13.67% |

| Increase Rank | Increased Percentage | District | Enhanced/ Eligible |
|---|---|---|---|
| | | Florida, M | 30.30% |
| 11 | 588.26% | NC, W | 47.83% |
| | | NC, E | 8.13% |
| | | NC, M | 42.86% |
| 12 | 471.43% | Washington, E | 10.71% |
| | | Washington, W | 2.27% |
| 13 | 366.15% | NY, N | 59.46% |
| | | NY, S | 16.24% |
| | | NY, W | 21.92% |
| | | NY, E | 16.39% |
| 14 | 341.71% | Indiana, S | 52.00% |
| | | Indiana, N | 15.22% |
| 15 | 322.92% | Michigan, E | 35.23% |
| | | Michigan, W | 10.91% |
| 16 | 267.77% | Virginia, W | 33.82% |
| | | Virginia, E | 12.63% |
| 17 | 192.86% | Alabama, N | 75.00% |
| | | Alabama, M | 38.89% |
| | | Alabama, S | 44.00% |
| 18 | 138.98% | WV, N | 6.78% |
| | | WV, S | 4.88% |
| 19 | 107.69% | Wisconsin, W | 25.00% |
| | | Wisconsin, E | 23.21% |
| 20 | 105.45% | Iowa, S | 83.56% |
| | | Iowa, N | 79.25% |
| - | - | Alaska | 12.50% |
| - | - | Arizona | 0.00% |
| - | - | Colorado | 0.00% |
| - | - | Connecticut | 42.17% |
| - | - | DC | 17.65% |
| - | - | Delaware | 50.00% |
| - | - | Guam | 100.00% |
| - | - | Hawaii | 52.38% |
| - | - | Idaho | 13.04% |
| - | - | Kansas | 21.95% |
| - | - | Maine | 10.00% |
| - | - | Maryland | 6.93% |
| - | - | Massachusetts | 49.09% |
| - | - | Minnesota | 7.50% |
| - | - | Montana | 54.84% |
| - | - | North Dakota | 44.44% |
| - | - | Nebraska | 3.13% |
| - | - | Nevada | 9.52% |
| - | - | NH | 11.54% |
| - | - | NJ | 5.06% |

Appendix B

| Increase Rank | Increased Percentage | District | Enhanced/ Eligible |
|---|---|---|---|
| - | - | NM | 3.33% |
| - | - | Oregon | 1.96% |
| - | - | Puerto Rico | 1.72% |
| - | - | Rhode Island | 16.67% |
| - | - | SC | 57.97% |
| - | - | South Dakota | 4.00% |
| - | - | Utah | 13.33% |
| - | - | Vermont | 7.69% |
| - | - | Virgin Islands | 0.00% |
| - | - | Wyoming | 13.64% |

### § 851 Enhancement Application or Waiver in the Eighth Circuit's Districts

Table 1C

| District | Total | Eligible | Eligible/ Total | Enhanced | Enhanced/ Eligible | Eligible - Enhanced | Intra-state discrepancy |
|----------|-------|----------|-----------------|----------|--------------------|---------------------|-------------------------|
| Iowa, S | 149 | 73 | 48.99% | 61 | 83.56% | 12 | 4.32% |
| Iowa, N | 107 | 53 | 49.53% | 42 | 79.25% | 11 | |
| Missouri, E | 286 | 147 | 51.40% | 15 | 10.20% | 132 | |
| Missouri, W | 191 | 79 | 41.36% | 36 | 45.57% | 43 | 35.37% |
| Minnesota | 211 | 80 | 37.91% | 6 | 7.50% | 74 | |
| Nebraska | 219 | 64 | 29.22% | 2 | 3.13% | 62 | |
| Arkansas, E | 86 | 40 | 46.51% | 2 | 5.00% | 38 | |
| Arkansas, W | 43 | 18 | 41.86% | 0 | 0.00% | 18 | 5.00% |
| N. Dakota | 57 | 27 | 47.37% | 12 | 44.44% | 15 | |
| S. Dakota | 75 | 25 | 33.33% | 1 | 4.00% | 24 | |

Figure 1C



Appendix C

**Increased Likelihood of Enhancement in the N.D. Iowa Compared to Districts in the Eighth Circuit\***

Table 2C

| Missouri, E | Missouri, W | Minnesota | Nebraska | Arkansas, E | N. Dakota | S. Dakota |
|---|---|---|---|---|---|---|
| 776.96% | 173.91% | 1056.67% | 2531.95% | 1585.00% | 178.33% | 1981.25% |

\*excluding W.D. Arkansas's zero application rate, and the S.D. of Iowa, which has a
slightly higher application rate

Average:    1183.44%

Figure 2C



Appendix C

## Comparison of Selected Adjacent Districts § 851 Application Rates

Table 3C

| District | Applied | Waived |
|----------|---------|--------|
| Iowa, N | 42 | 11 |
| Minnesota | 6 | 74 |
| Nebraska | 2 | 62 |
| S. Dakota | 1 | 24 |

Figure 3C



Appendix C

## Comparison of Selected Adjacent Districts § 851 Application Rates Including Ineligible Defendants

Table 4C

| District | Total | Applied | Waived | Ineligible |
|---|---|---|---|---|
| Iowa, N | 107 | 42 | 11 | 54 |
| Minnesota | 211 | 6 | 74 | 131 |
| Nebraska | 219 | 2 | 62 | 155 |
| S. Dakota | 75 | 1 | 24 | 50 |

Figure 4C



Appendix C

**<u>Comparison of Selected Adjacent Districts § 851 Enhancement Application Frequency</u>**

Table 5C

| District | Enhanced/ Eligible |
|----------|--------------------|
| Iowa, N | 79.25% |
| Minnesota | 7.50% |
| Nebraska | 3.13% |
| S. Dakota | 4.00% |

Figure 5C



**Drug Offender Elgibility for 21 U.S.C. § 851 Penalty Enhancement By Circuit**
**Fiscal Year 2006, 2008, and 2009 Sample Groups**

Table 1D

| Cir. | District | Total | Eligible | Eligible/ Total | Enhanced | Enhanced/ Eligible | Intra-Circuit Disparity | Cir. Avg. |
|---|---|---|---|---|---|---|---|---|
| 1 | Massachusetts | 135 | 55 | 41% | 27 | 49.09% | | |
| 1 | Rhode Island | 32 | 18 | 56% | 3 | 16.67% | | |
| 1 | NH | 77 | 26 | 34% | 3 | 11.54% | | |
| 1 | Maine | 51 | 10 | 20% | 1 | 10.00% | | |
| 1 | Puerto Rico | 160 | 58 | 36% | 1 | 1.72% | | |
| 1 | | | 167 | | 35 | | 47.37% | 17.80% |
| | | | | | | | | |
| 2 | NY, N | 93 | 37 | 40% | 22 | 59.46% | | |
| 2 | Connecticut | 129 | 83 | 64% | 35 | 42.17% | | |
| 2 | NY, W | 152 | 73 | 48% | 16 | 21.92% | | |
| 2 | NY, E | 187 | 61 | 33% | 10 | 16.39% | | |
| 2 | NY, S | 246 | 117 | 48% | 19 | 16.24% | | |
| 2 | Vermont | 73 | 26 | 36% | 2 | 7.69% | | |
| 2 | | | 397 | | 104 | | 51.77% | 27.31% |
| | | | | | | | | |
| 3 | PA, E | 175 | 91 | 52% | 52 | 57.14% | | |
| 3 | Delaware | 15 | 8 | 53% | 4 | 50.00% | | |
| 3 | PA, W | 95 | 46 | 48% | 17 | 36.96% | | |
| 3 | NJ | 141 | 79 | 56% | 4 | 5.06% | | |
| 3 | PA, M | 177 | 79 | 45% | 2 | 2.53% | | |
| 3 | Virgin Islands | 10 | 4 | 40% | 0 | 0.00% | | |
| 3 | | | 307 | | 79 | | 57.14% | 25.28% |
| | | | | | | | | |
| 4 | SC | 363 | 207 | 57% | 120 | 57.97% | | |
| 4 | NC, W | 189 | 92 | 49% | 44 | 47.83% | | |
| 4 | NC, M | 120 | 63 | 53% | 27 | 42.86% | | |
| 4 | Virginia, W | 174 | 68 | 39% | 23 | 33.82% | | |
| 4 | Virginia, E | 350 | 190 | 54% | 24 | 12.63% | | |
| 4 | Maryland | 147 | 101 | 69% | 7 | 6.93% | | |
| 4 | NC, E | 184 | 123 | 67% | 10 | 8.13% | | |
| 4 | WV, N | 163 | 59 | 36% | 4 | 6.78% | | |
| 4 | WV, S | 106 | 41 | 39% | 2 | 4.88% | | |
| 4 | | | 944 | | 261 | | 53.09% | 24.65% |

| Cir. | District | Total | Eligible | Eligible/ Total | Enhanced | Enhanced/ Eligible | Intra-Circuit Disparity | Cir. Avg. |
|---|---|---|---|---|---|---|---|---|
| 5 | Louisiana, W | 69 | 35 | 51% | 20 | 57.14% | | |
| 5 | TX, W | 1,087 | 334 | 31% | 127 | 38.02% | | |
| 5 | Louisiana, E | 98 | 52 | 53% | 17 | 32.69% | | |
| 5 | TX, S | 682 | 205 | 30% | 23 | 11.22% | | |
| 5 | TX, E | 267 | 102 | 38% | 6 | 5.88% | | |
| 5 | Mississippi, S | 62 | 24 | 39% | 1 | 4.17% | | |
| 5 | TX, N | 184 | 68 | 37% | 1 | 1.47% | | |
| 5 | Louisiana, M | 35 | 15 | 43% | 0 | 0.00% | | |
| 5 | Mississippi, N | 48 | 17 | 35% | 0 | 0.00% | | |
| **5** | | | 852 | | 195 | | 57.14% | 16.73% |
| | | | | | | | | |
| 6 | Tennessee, E | 228 | 84 | 37% | 61 | 72.62% | | |
| 6 | Kentucky, E | 197 | 83 | 42% | 53 | 63.86% | | |
| 6 | Ohio, N | 153 | 83 | 54% | 48 | 57.83% | | |
| 6 | Michigan, E | 172 | 88 | 51% | 31 | 35.23% | | |
| 6 | Michigan, W | 109 | 55 | 50% | 6 | 10.91% | | |
| 6 | Kentucky, W | 96 | 53 | 55% | 5 | 9.43% | | |
| 6 | Tennessee, M | 46 | 23 | 50% | 2 | 8.70% | | |
| 6 | Tennessee, W | 109 | 55 | 50% | 1 | 1.82% | | |
| 6 | Ohio, S | 180 | 62 | 34% | 0 | 0.00% | | |
| **6** | | | 586 | | 207 | | 72.62% | 28.93% |
| | | | | | | | | |
| 7 | Illinois, C | 125 | 76 | 61% | 60 | 78.95% | | |
| 7 | Illinois, S | 115 | 55 | 48% | 34 | 61.82% | | |
| 7 | Indiana, S | 97 | 50 | 52% | 26 | 52.00% | | |
| 7 | Wisconsin, W | 44 | 20 | 45% | 5 | 25.00% | | |
| 7 | Wisconsin, E | 130 | 56 | 43% | 13 | 23.21% | | |
| 7 | Indiana, N | 111 | 46 | 41% | 7 | 15.22% | | |
| 7 | Illinois, N | 204 | 86 | 42% | 10 | 11.63% | | |
| **7** | | | 389 | | 155 | | 67.32% | 38.26% |
| | | | | | | | | |
| 8 | Iowa, S | 149 | 73 | 49% | 61 | 83.56% | | |
| 8 | Iowa, N | 107 | 53 | 50% | 42 | 79.25% | | |
| 8 | Missouri, W | 191 | 79 | 41% | 36 | 45.57% | | |
| 8 | North Dakota | 57 | 27 | 47% | 12 | 44.44% | | |
| 8 | Missouri, E | 286 | 147 | 51% | 15 | 10.20% | | |
| 8 | Minnesota | 211 | 80 | 38% | 6 | 7.50% | | |
| 8 | Arkansas, E | 86 | 40 | 47% | 2 | 5.00% | | |
| 8 | South Dakota | 75 | 25 | 33% | 1 | 4.00% | | |
| 8 | Nebraska | 219 | 64 | 29% | 2 | 3.13% | | |
| 8 | Arkansas, W | 43 | 18 | 42% | 0 | 0.00% | | |
| **8** | | | 606 | | 177 | | 83.56% | 28.27% |

| Cir. | District | Total | Eligible | Eligible/ Total | Enhanced | Enhanced/ Eligible | Intra-Circuit Disparity | Cir. Avg. |
|---|---|---|---|---|---|---|---|---|
| 9 | Guam | 9 | 3 | 33% | 3 | 100.00% | | |
| 9 | Montana | 74 | 31 | 42% | 17 | 54.84% | | |
| 9 | Hawaii | 74 | 21 | 28% | 11 | 52.38% | | |
| 9 | Idaho | 58 | 23 | 40% | 3 | 13.04% | | |
| 9 | Alaska | 35 | 16 | 46% | 2 | 12.50% | | |
| 9 | California, C | 175 | 65 | 37% | 7 | 10.77% | | |
| 9 | Washington, E | 65 | 28 | 43% | 3 | 10.71% | | |
| 9 | Nevada | 45 | 21 | 47% | 2 | 9.52% | | |
| 9 | California, E | 157 | 62 | 39% | 5 | 8.06% | | |
| 9 | California, N | 102 | 57 | 56% | 3 | 5.26% | | |
| 9 | Washington, W | 115 | 44 | 38% | 1 | 2.27% | | |
| 9 | Oregon | 73 | 51 | 70% | 1 | 1.96% | | |
| 9 | California, S | 402 | 131 | 33% | 2 | 1.53% | (Including | |
| 9 | Arizona | 369 | 84 | 23% | 0 | 0.00% | Guam, 100%) | |
| 9 | | | 634 | | 57 | | 54.84% | 20.20% |
| | | | | | | | | |
| 10 | Kansas | 192 | 82 | 1% | 18 | 21.95% | | |
| 10 | Wyoming | 135 | 44 | 33% | 6 | 13.64% | | |
| 10 | Utah | 93 | 45 | 48% | 6 | 13.33% | | |
| 10 | Oklahoma, W | 50 | 20 | 40% | 2 | 10.00% | | |
| 10 | Oklahoma, N | 43 | 14 | 33% | 1 | 7.14% | | |
| 10 | NM | 224 | 60 | 27% | 2 | 3.33% | | |
| 10 | Colorado | 73 | 26 | 36% | 0 | 0.00% | | |
| 10 | Oklahoma, E | 11 | 6 | 55% | 0 | 0.00% | | |
| 10 | | | 297 | | 35 | | 21.95% | 8.67% |
| | | | | | | | | |
| 11 | Florida, N | 131 | 69 | 53% | 60 | 86.96% | | |
| 11 | Alabama, N | 70 | 36 | 51% | 27 | 75.00% | | |
| 11 | Georgia, N | 117 | 40 | 34% | 19 | 47.50% | | |
| 11 | Alabama, S | 115 | 75 | 65% | 33 | 44.00% | | |
| 11 | Alabama, M | 49 | 18 | 37% | 7 | 38.89% | | |
| 11 | Florida, M | 401 | 165 | 41% | 50 | 30.30% | | |
| 11 | Florida, S | 340 | 139 | 41% | 19 | 13.67% | | |
| 11 | Georgia, S | 80 | 43 | 54% | 3 | 6.98% | | |
| 11 | Georgia, M | 100 | 52 | 52% | 1 | 1.92% | | |
| 11 | | | 637 | | 219 | | 85.03% | 38.36% |
| | | | | | | | | |
| DC | DC | 101 | 51 | 50% | 9 | 17.65% | | 17.65% |

Average  Average
59.26%   24.34%

Appendix D

**<u>Range and Average of § 851 Enhancement Application
to Eligible Offenders by Circuit\*</u>**

Figure 1D



\*The D.C. Circuit's average application rate is 17.65%

Appendix E

## Drug Offender Elgibility for 21 U.S.C. § 851 Enhancement By District Alphabetically
## Fiscal Year 2006, 2008, and 2009 Sample Groups

Table 1E

| District | Total | Eligible | Eligible/ Total | Enhanced | Enhanced/ Eligible | Intra-state Discrepancy |
|---|---|---|---|---|---|---|
| Alabama, M | 49 | 18 | 37% | 7 | 38.89% | |
| Alabama, N | 70 | 36 | 51% | 27 | 75.00% | |
| Alabama, S | 115 | 75 | 65% | 33 | 44.00% | 192.86% |
| Alaska | 35 | 16 | 46% | 2 | 12.50% | |
| Arizona | 369 | 84 | 23% | 0 | 0.00% | |
| Arkansas, E | 86 | 40 | 47% | 2 | 5.00% | |
| Arkansas, W | 43 | 18 | 42% | 0 | 0.00% | ∞ |
| CA, C | 175 | 65 | 37% | 7 | 10.77% | |
| CA, E | 157 | 62 | 39% | 5 | 8.06% | |
| CA, N | 102 | 57 | 56% | 3 | 5.26% | |
| CA, S | 402 | 131 | 33% | 2 | 1.53% | 705.38% |
| Colorado | 73 | 26 | 36% | 0 | 0.00% | |
| Connecticut | 129 | 83 | 64% | 35 | 42.17% | |
| DC | 101 | 51 | 50% | 9 | 17.65% | |
| Delaware | 15 | 8 | 53% | 4 | 50.00% | |
| Florida, M | 401 | 165 | 41% | 50 | 30.30% | |
| Florida, N | 131 | 69 | 53% | 60 | 86.96% | |
| Florida, S | 340 | 139 | 41% | 19 | 13.67% | 636.16% |
| Georgia, M | 100 | 52 | 52% | 1 | 1.92% | |
| Georgia, N | 117 | 40 | 34% | 19 | 47.50% | |
| Georgia, S | 80 | 43 | 54% | 3 | 6.98% | 2470.00% |
| Guam | 9 | 3 | 33% | 3 | 100.00% | |
| Hawaii | 74 | 21 | 28% | 11 | 52.38% | |
| Idaho | 58 | 23 | 40% | 3 | 13.04% | |
| Illinois, C | 125 | 76 | 61% | 60 | 78.95% | |
| Illinois, N | 204 | 86 | 42% | 10 | 11.63% | |
| Illinois, S | 115 | 55 | 48% | 34 | 61.82% | 678.95% |
| Indiana, N | 111 | 46 | 41% | 7 | 15.22% | |
| Indiana, S | 97 | 50 | 52% | 26 | 52.00% | 341.71% |
| Iowa, N | 107 | 53 | 50% | 42 | 79.25% | |
| Iowa, S | 149 | 73 | 49% | 61 | 83.56% | 105.45% |
| Kansas | 192 | 82 | 1% | 18 | 21.95% | |
| Kentucky, E | 197 | 83 | 42% | 53 | 63.86% | |
| Kentucky, W | 96 | 53 | 55% | 5 | 9.43% | 676.87% |
| Louisiana, E | 98 | 52 | 53% | 17 | 32.69% | |
| Louisiana, M | 35 | 15 | 43% | 0 | 0.00% | |
| Louisiana, W | 69 | 35 | 51% | 20 | 57.14% | ∞ |
| Maine | 51 | 10 | 20% | 1 | 10.00% | |
| Maryland | 147 | 101 | 69% | 7 | 6.93% | |

# Appendix E

| District | Total | Eligible | Eligible/ Total | Enhanced | Enhanced/ Eligible | Intra-state Discrepancy |
|---|---|---|---|---|---|---|
| Massachusetts | 135 | 55 | 41% | 27 | 49.09% | |
| Michigan, E | 172 | 88 | 51% | 31 | 35.23% | |
| Michigan, W | 109 | 55 | 50% | 6 | 10.91% | 322.92% |
| Minnesota | 211 | 80 | 38% | 6 | 7.50% | |
| Mississippi, N | 48 | 17 | 35% | 0 | 0.00% | |
| Mississippi, S | 62 | 24 | 39% | 1 | 4.17% | 4.17% |
| Missouri, E | 286 | 147 | 51% | 15 | 10.20% | |
| Missouri, W | 191 | 79 | 41% | 36 | 45.57% | 22.39% |
| Montana | 74 | 31 | 42% | 17 | 54.84% | |
| NC, E | 184 | 123 | 67% | 10 | 8.13% | |
| NC, M | 120 | 63 | 53% | 27 | 42.86% | |
| NC, W | 189 | 92 | 49% | 44 | 47.83% | 588.26% |
| North Dakota | 57 | 27 | 47% | 12 | 44.44% | |
| Nebraska | 219 | 64 | 29% | 2 | 3.13% | |
| Nevada | 45 | 21 | 47% | 2 | 9.52% | |
| NH | 77 | 26 | 34% | 3 | 11.54% | |
| NJ | 141 | 79 | 56% | 4 | 5.06% | |
| NM | 224 | 60 | 27% | 2 | 3.33% | |
| NY, E | 187 | 61 | 33% | 10 | 16.39% | |
| NY, N | 93 | 37 | 40% | 22 | 59.46% | |
| NY, S | 246 | 117 | 48% | 19 | 16.24% | |
| NY, W | 152 | 73 | 48% | 16 | 21.92% | 366.15% |
| Ohio, N | 153 | 83 | 54% | 48 | 57.83% | |
| Ohio, S | 180 | 62 | 34% | 0 | 0.00% | ∞ |
| Oklahoma, E | 11 | 6 | 55% | 0 | 0.00% | |
| Oklahoma, N | 43 | 14 | 33% | 1 | 7.14% | |
| Oklahoma, W | 50 | 20 | 40% | 2 | 10.00% | ∞ |
| Oregon | 73 | 51 | 70% | 1 | 1.96% | |
| PA, E | 175 | 91 | 52% | 52 | 57.14% | |
| PA, M | 177 | 79 | 45% | 2 | 2.53% | |
| PA, W | 95 | 46 | 48% | 17 | 36.96% | 2257.14% |
| Puerto Rico | 160 | 58 | 36% | 1 | 1.72% | |
| Rhode Island | 32 | 18 | 56% | 3 | 16.67% | |
| SC | 363 | 207 | 57% | 120 | 57.97% | |
| South Dakota | 75 | 25 | 33% | 1 | 4.00% | |
| Tennesee, E | 228 | 84 | 37% | 61 | 72.62% | |
| Tennesee, M | 46 | 23 | 50% | 2 | 8.70% | |
| Tennesee, W | 109 | 55 | 50% | 1 | 1.82% | 3994.05% |
| TX, E | 267 | 102 | 38% | 6 | 5.88% | |
| TX, N | 184 | 68 | 37% | 1 | 1.47% | |
| TX, S | 682 | 205 | 30% | 23 | 11.22% | |
| TX, W | 1,087 | 334 | 31% | 127 | 38.02% | 2585.63% |
| Utah | 93 | 45 | 48% | 6 | 13.33% | |
| Virginia, E | 350 | 190 | 54% | 24 | 12.63% | |

Appendix E

| District | Total | Eligible | Eligible/ Total | Enhanced | Enhanced/ Eligible | Intra-state Discrepancy |
|---|---|---|---|---|---|---|
| Virginia, W | 174 | 68 | 39% | 23 | 33.82% | 267.77% |
| Vermont | 73 | 26 | 36% | 2 | 7.69% | |
| Virgin Islands | 10 | 4 | 40% | 0 | 0.00% | |
| Washington, E | 65 | 28 | 43% | 3 | 10.71% | |
| Washington, W | 115 | 44 | 38% | 1 | 2.27% | 471.43% |
| Wisconsin, E | 130 | 56 | 43% | 13 | 23.21% | |
| Wisonsin, W | 44 | 20 | 45% | 5 | 25.00% | 107.69% |
| WV, N | 163 | 59 | 36% | 4 | 6.78% | |
| WV, S | 106 | 41 | 39% | 2 | 4.88% | 138.98% |
| Wyoming | 135 | 44 | 33% | 6 | 13.64% | |
| Total | Total | Total | Average | Total | Average | Average |
| 93 | 13,894 | 5870 | 42.25% | 1,536 | 26.17% | 846.70% |

**N.D. of Iowa Compared to National § 851 Enhancement Statistics**

Table 2E



| Iowa, N.D. | 79.25% |
|---|---|
| Average: | 26.17% |
| Median: | 12.63% |
| Mode: | 0% |

Figure 1E



**<u>Number of District's Application Rate by Thirds</u>**

Table 3E

| | | |
|---|---|---|
| < 33.3% | 62 | 66.67% |
| 33.3-66.6% | 24 | 25.81% |
| > 66.6% | 7 | 7.53% |

districts*                93

*N. Mariana Islands Unreported

Eligible Defendants in Districts with 0% Application: 232

# Drug Offender Eligibility for 21 U.S.C. § 851 Penalty Enhancement
## By District
### Fiscal Year 2006, 2008, and 2009 Sample Groups

| Rate % | Enhanced N | District | Rate % | Eligible N | Total N |
|---|---|---|---|---|---|
| 17.6 | 9 | District of Columbia | 50.5 | 51 | 101 |
| 10.0 | 1 | Maine | 19.6 | 10 | 51 |
| 49.1 | 27 | Massachusetts | 40.7 | 55 | 135 |
| 11.5 | 3 | New Hampshire | 33.8 | 26 | 77 |
| 1.7 | 1 | Puerto Rico | 36.3 | 58 | 160 |
| 16.7 | 3 | Rhode Island | 56.3 | 18 | 32 |
| 42.2 | 35 | Connecticut | 64.3 | 83 | 129 |
| 16.4 | 10 | New York, Eastern | 32.6 | 61 | 187 |
| 59.5 | 22 | New York, Northern | 39.8 | 37 | 93 |
| 16.2 | 19 | New York, Southern | 47.6 | 117 | 246 |
| 21.9 | 16 | New York, Western | 48.0 | 73 | 152 |
| 7.7 | 2 | Vermont | 35.6 | 26 | 73 |
| 50.0 | 4 | Delaware | 53.3 | 8 | 15 |
| 5.1 | 4 | New Jersey | 56.0 | 79 | 141 |
| 57.1 | 52 | Pennsylvania, Eastern | 52.0 | 91 | 175 |
| 2.5 | 2 | Pennsylvania, Middle | 44.6 | 79 | 177 |
| 37.0 | 17 | Pennsylvania, Western | 48.4 | 46 | 95 |
| . | . | Virgin Islands | 40.0 | 4 | 10 |
| 6.9 | 7 | Maryland | 68.7 | 101 | 147 |
| 8.1 | 10 | North Carolina, Eastern | 66.8 | 123 | 184 |
| 42.9 | 27 | North Carolina, Middle | 52.5 | 63 | 120 |
| 47.8 | 44 | North Carolina, Western | 48.7 | 92 | 189 |
| 58.0 | 120 | South Carolina | 57.0 | 207 | 363 |
| 12.6 | 24 | Virginia, Eastern | 54.3 | 190 | 350 |
| 33.8 | 23 | Virginia, Western | 39.1 | 68 | 174 |
| 6.8 | 4 | West Virginia, Northern | 36.2 | 59 | 163 |
| 4.9 | 2 | West Virginia, Southern | 38.7 | 41 | 106 |
| 32.7 | 17 | Louisiana, Eastern | 53.1 | 52 | 98 |
| . | . | Louisiana, Middle | 42.9 | 15 | 35 |
| 57.1 | 20 | Louisiana, Western | 50.7 | 35 | 69 |
| . | . | Mississippi, Northern | 35.4 | 17 | 48 |
| 4.2 | 1 | Mississippi, Southern | 38.7 | 24 | 62 |
| 5.9 | 6 | Texas, Eastern | 38.2 | 102 | 267 |

*For information regarding methodology, see the 'Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System'.*
*SOURCE: U.S. Sentencing Commission, 2006, 2008, and 2009 '851' Datafiles.*

## Drug Offender Eligibility for 21 U.S.C. § 851 Penalty Enhancement
### By District
### Fiscal Year 2006, 2008, and 2009 Sample Groups

| Rate % | Enhanced N | District | Rate % | Eligible N | Total N |
|---|---|---|---|---|---|
| 1.5 | 1 | Texas, Northern | 37.0 | 68 | 184 |
| 11.2 | 23 | Texas, Southern | 30.1 | 205 | 682 |
| 38.0 | 127 | Texas, Western | 30.7 | 334 | 1087 |
| 63.9 | 53 | Kentucky, Eastern | 42.1 | 83 | 197 |
| 9.4 | 5 | Kentucky, Western | 55.2 | 53 | 96 |
| 35.2 | 31 | Michigan, Eastern | 51.2 | 88 | 172 |
| 10.9 | 6 | Michigan, Western | 50.5 | 55 | 109 |
| 57.8 | 48 | Ohio, Northern | 54.2 | 83 | 153 |
| . | . | Ohio, Southern | 34.4 | 62 | 180 |
| 72.6 | 61 | Tennessee, Eastern | 36.8 | 84 | 228 |
| 8.7 | 2 | Tennessee, Middle | 50.0 | 23 | 46 |
| 1.8 | 1 | Tennessee, Western | 50.5 | 55 | 109 |
| 78.9 | 60 | Illinois, Central | 60.8 | 76 | 125 |
| 11.6 | 10 | Illinois, Northern | 42.2 | 86 | 204 |
| 61.8 | 34 | Illinois, Southern | 47.8 | 55 | 115 |
| 15.2 | 7 | Indiana, Northern | 41.4 | 46 | 111 |
| 52.0 | 26 | Indiana, Southern | 51.5 | 50 | 97 |
| 23.2 | 13 | Wisconsin, Eastern | 43.1 | 56 | 130 |
| 25.0 | 5 | Wisconsin, Western | 45.5 | 20 | 44 |
| 5.0 | 2 | Arkansas, Eastern | 46.5 | 40 | 86 |
| . | . | Arkansas, Western | 41.9 | 18 | 43 |
| 79.2 | 42 | Iowa, Northern | 49.5 | 53 | 107 |
| 83.6 | 61 | Iowa, Southern | 49.0 | 73 | 149 |
| 7.5 | 6 | Minnesota | 37.9 | 80 | 211 |
| 10.2 | 15 | Missouri, Eastern | 51.4 | 147 | 286 |
| 45.6 | 36 | Missouri, Western | 41.4 | 79 | 191 |
| 3.1 | 2 | Nebraska | 29.2 | 64 | 219 |
| 44.4 | 12 | North Dakota | 47.4 | 27 | 57 |
| 4.0 | 1 | South Dakota | 33.3 | 25 | 75 |
| 12.5 | 2 | Alaska | 45.7 | 16 | 35 |
| . | . | Arizona | 22.8 | 84 | 369 |
| 10.8 | 7 | California, Central | 37.1 | 65 | 175 |
| 8.1 | 5 | California, Eastern | 39.5 | 62 | 157 |

*For information regarding methodology, see the 'Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System'.*
*SOURCE: U.S. Sentencing Commission, 2006, 2008, and 2009 '851' Datafiles.*

# Drug Offender Eligibility for 21 U.S.C. § 851 Penalty Enhancement
## By District
### Fiscal Year 2006, 2008, and 2009 Sample Groups

| Rate % | Enhanced N | District | Rate % | Eligible N | Total N |
|---|---|---|---|---|---|
| 5.3 | 3 | California, Northern | 55.9 | 57 | 102 |
| 1.5 | 2 | California, Southern | 32.6 | 131 | 402 |
| 100.0 | 3 | Guam | 33.3 | 3 | 9 |
| 52.4 | 11 | Hawaii | 28.4 | 21 | 74 |
| 13.0 | 3 | Idaho | 39.7 | 23 | 58 |
| 54.8 | 17 | Montana | 41.9 | 31 | 74 |
| 9.5 | 2 | Nevada | 46.7 | 21 | 45 |
| | | Northern Mariana Islands | . | . | 1 |
| 2.4 | 1 | Oregon | 56.2 | 41 | 73 |
| 10.7 | 3 | Washington, Eastern | 43.1 | 28 | 65 |
| 2.3 | 1 | Washington, Western | 38.3 | 44 | 115 |
| . | . | Colorado | 35.6 | 26 | 73 |
| 22.0 | 18 | Kansas | 42.7 | 82 | 192 |
| 3.3 | 2 | New Mexico | 26.8 | 60 | 224 |
| . | . | Oklahoma, Eastern | 54.5 | 6 | 11 |
| 7.1 | 1 | Oklahoma, Northern | 32.6 | 14 | 43 |
| 10.0 | 2 | Oklahoma, Western | 40.0 | 20 | 50 |
| 13.3 | 6 | Utah | 48.4 | 45 | 93 |
| 13.6 | 6 | Wyoming | 32.6 | 44 | 135 |
| 38.9 | 7 | Alabama, Middle | 36.7 | 18 | 49 |
| 75.0 | 27 | Alabama, Northern | 51.4 | 36 | 70 |
| 44.0 | 33 | Alabama, Southern | 48.4 | 75 | 155 |
| 30.3 | 50 | Florida, Middle | 41.1 | 165 | 401 |
| 87.0 | 60 | Florida, Northern | 52.7 | 69 | 131 |
| 13.7 | 19 | Florida, Southern | 40.9 | 139 | 340 |
| 1.9 | 1 | Georgia, Middle | 52.0 | 52 | 100 |
| 47.5 | 19 | Georgia, Northern | 34.2 | 40 | 117 |
| 7.0 | 3 | Georgia, Southern | 53.8 | 43 | 80 |

*For information regarding methodology, see the 'Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System'.*
*SOURCE: U.S. Sentencing Commission, 2006, 2008, and 2009 '851' Datafiles.*